**FAIC SECURITIES, INC., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**SECURITIES INDUSTRY ASSOCIATION, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Defendants.**

Civ. A. Nos. 84–0959, 84–1136.

United States District Court, District of Columbia.

June 20, 1984.

James E. Kaplan, Jeffrey C. Martin, Washington, D.C., for plaintiff in No. 84–0959.

John M. Liftin, Washington, D.C., James B. Weidner, New York City, for plaintiff in No. 84–1136.

Judith F. Ledbetter, Sandra M. Schraibman, Washington, D.C., for defendants.

James A. Smith, John Lansdale, Jr., Washington, D.C., for FHLBB and FSLIC.

## MEMORANDUM

GESELL, District Judge.

█ Cross-motions for summary judgment in these consolidated cases present the questions whether regulations adopted by the Federal Deposit Insurance Corporation (FDIC) and the Federal Home Loan Bank Board (Bank Board) are authorized by the statutes which govern those agencies and whether the regulations were promulgated in accord with the requirements of the Administrative Procedure Act. Plaintiffs, an individual deposit brokerage firm and a trade association whose members engage in the deposit broker business, seek to set aside regulations intended to virtually eliminate federal deposit insurance for funds place in insured financial institutions through deposit brokers.[1] The issues have been exhaustively briefed and the Court has had the benefit of full oral argument. For the reasons given below, the Court concludes that the challenged regulations are inconsistent with governing statutory law and must therefore be struck down.

Federal deposit insurance was developed during the Great Depression for the purpose of restoring confidence in the nation's banks and stimulating economic growth. In 1933 the FDIC was created, and a year later the Federal Savings and Loan Insurance Corporation (FSLIC) was established under the control of the Bank Board.[2] Banking practices were relatively simple in that era. Depositors dealt largely with traditional banks and savings and loan associations (S & L's) located near their homes or offices. Regulation of institutions was a manageable task, and with the tools provided by their enabling statutes the FDIC and FSLIC were successful in returning the banking system to a sound footing.

Today these New Deal statutes must be applied to an entirely different world. Banking is no longer a simple neighborhood affair. Depositors are more sophisticated, and as a result of advances in technology they are able to shop nationwide in search of the highest return on their money and can transfer their funds electronically from one institution to another virtually instantaneously. Recent legislation easing restrictions on financial institutions has also increased competitive pressure in the banking business, with brokerage concerns and S & L's nudging more and more into traditional banking endeavors. As a result of these changes banks and S & L's have adopted new techniques in an effort to attract capital, and the FDIC and the Bank Board have been faced with problems heretofore unknown.

The present controversy is well in point. Within the past several years a new type of business has flourished whose members are known as "deposit brokers." These

---

1. Plaintiffs clearly have standing, both to assert their own interests and the interests of their clients. Under *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the interest asserted by plaintiffs must fall *"arguably* within the zone of interest to be protected *or regulated."* 397 U.S. at 152–53, 90 S.Ct. at 829 [emphasis added]. *See also Glass Packaging Institute v. Regan*, 737 F.2d 1083, at 1088 (D.C. Cir.1984) (zone of interests test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefitted *or regulated* by the statute under which suit is brought," *quoting Copper & Brass Fabricators Council, Inc. v. Dep't of the Treasury*, 679 F.2d 951, 952 (D.C.Cir.1982) [emphasis added] ). Here plaintiffs' interests are clearly being regulated. Plaintiffs can also assert the rights of those who would be denied insurance coverage under the new regulations, namely the depositors themselves. "Vendors and those in like positions have been uniformly permitted to resist efforts restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) [citations omitted].

2. Federal Deposit Insurance Act (FDIA), Pub.L. No. 73–66, 48 Stat. 162 (1933); National Housing Act (NHA), Pub.L. No. 73–479, 48 Stat. 1246 (1934). The authority of the FDIC was made permanent with passage of the Banking Act of 1935, Pub.L. No. 74–305, 49 Stat. 684 (1935).

brokers bring together many individual depositors and arrange for their separate funds to be placed in financial institutions throughout the nation which are willing to pay high rates for brokered deposits which may aggregate into the millions of dollars. The broker may simply "match" the financial institution with its customers and arrange for them to deposit their funds directly with that institution, or the broker may itself deposit the funds, indicating to the bank that the funds are actually owned by the broker's individual customers. In either event, the broker's customers as beneficial owners of the deposited money each receive the security of federal deposit insurance up to the statutory limit of $100,-000 per individual depositor per institution.[3]

The deposit brokerage business provides advantages to banks as well. Smaller banks can, through deposit brokers, solicit relatively large amounts of capital to help them finance local growth and development. The FDIC and the Bank Board, however, argue that this process is also subject to considerable abuse. Banks or S & L's bordering on insolvency can, by offering high interest rates, attract large sums in a very short period in an effort to stave off failure of the institution. Because the brokered accounts are federally insured, these agencies contend, neither the brokers nor their customers adequately investigate the institution's financial condition before depositing their funds. The result, when the bank or S & L is unable to stave off failure, is that the potential cost to the insuring agencies of making payment on the insured accounts is significantly increased due to the last-minute influx of brokered deposits.

The past several years has seen an alarming increase in failures by banks and S & L's, placing considerable strain on the insurance funds. In at least several of these instances the FDIC and the Bank

Board have concluded that the presence of brokered deposits in failed financial institutions has unduly exacerbated demands on the insurance funds. In order to deal with this perceived threat to the integrity of the insurance funds, the FDIC and the Bank Board have promulgated regulations which would, in essence, virtually eliminate federal insurance for funds placed by or through deposit brokers. The new regulations read, in pertinent part:

> Notwithstanding any other provision of this part [12 C.F.R. Part 330 (FDIC); 12 C.F.R. Part 564 (Bank Board)], funds deposited by or through a deposit broker shall be added to any other deposits placed by or through that deposit broker and insured up to $100,000 in the aggregate. This subsection shall apply to all accounts opened, added to, or renewed on or after October 1, 1984, [with certain exceptions regarding the effective date].

Brokered Deposits; Limitations on Deposit Insurance, 49 Fed.Reg. 13,003, 13,011 (April 2, 1984). Rather than limiting insurance to $100,000 *per depositor* per financial institution, the new regulations would lump together all funds placed in a particular institution through a single deposit broker and limit insurance to $100,000 *per deposit broker*. The insurance ceiling would thus not be based on beneficial ownership of the deposits or, in the case of those deposits held directly by a deposit broker's customers, even on who is listed as the nominal depositor on the records of the financial institution, but instead on the basis of how the deposits were made. Thus an individual who deposits $10,000 in a particular institution on his own initiative, and then subsequently utilizes the services of a deposit broker to place an additional $10,000 deposit with that institution, would presumably be fully insured on the

---

**3.** Some brokers, such as plaintiff FAIC Securities, Inc., specialize in "splitting" funds from large investors into $100,000 increments which are then placed in different financial institutions in order to obtain federal deposit insurance for all of the investors' funds. Other brokers, principally certain members of plaintiff Securities Industry Association, primarily serve small investors with only a few thousand dollars to invest. In either event, the amount placed by the broker in one institution typically exceeds $100,000 in the aggregate.

first deposit but would be at risk on the second.[4]

Plaintiffs argue that the new regulations are inconsistent with the FDIA and the NHA, which they contend guarantee *each* depositor insurance up to $100,000 per institution no matter how the actual deposit is arranged. The FDIC and the Bank Board disagree with this interpretation of the statutes, and point to several statutory provisions which they argue give them authority to promulgate the challenged regulations. The Court must consider, therefore, both the extent of insurance coverage which the FDIA and the NHA were intended to provide and the extent to which Congress has given the FDIC and the Bank Board authority to alter such coverage.[5]

The FDIA and the NHA were designed to provide stability to the banking industry by guaranteeing federal deposit insurance to depositors in qualifying institutions. As the statutes governing the FDIC and the Bank Board make clear, these agencies are *required* to provide such insurance. "[The FDIC] *shall* insure ... the deposits of all banks which are entitled to the benefits of insurance under this chapter." 12 U.S.C. § 1811 [emphasis added]. *See also* 12 U.S.C. § 1821(a)(1). An insured deposit is defined as "the net amount due to *any* depositor" up to $100,000, § 1813(m)(1) [emphasis added], and if an institution fails the FDIC is directed to make payment on insured accounts. § 1821(f). Likewise, "[the FSLIC] *shall* insure the accounts of institutions eligible for insurance," and each insured institution "*shall* be entitled" to insurance up to $100,000 for "the accounts of *each* of its members and investors." 12 U.S.C. §§ 1725(a), 1728(a) [emphasis added]. The FSLIC is also specifi-

cally directed to make payment on insured accounts in failed S & L's. § 1728(b).

■ The legislative history of the Banking Act of 1935 makes clear that the "depositor" who is entitled to the deposit insurance under the statute is the beneficial owner of the account, at least where his ownership is reflected on the books of the bank. "The law specifically makes the test the individual ownership." *Banking Act: Hearings on H.R. 5357 Before the House Comm. on Banking and Currency*, 74th Cong., 1st Sess. 27 (1935) (statement of Banking Comm. Chmn. Steagall). "[T]he command seems to be clear ... where the records of the institution show for whose benefit the account is maintained the legal measure of insurance protection for each cannot be withheld." *Id.*, at 128 (statement of FDIC general counsel L.E. Birdzell).[6] The National Housing Act, which is generally to be construed together with the FDIA, similarly contemplates that deposit insurance will run in favor of the owner of the deposit, although its language and statutory history are somewhat less explicit. *See* 12 U.S.C. § 1724(b) (defining "insured member" as "an individual, partnership, association, or corporation which holds an insured account").

This interpretation of the statute has consistently been followed by the FDIC and by the Bank Board in administrative interpretations prior to the present controversy. *See, e.g.*, 11 Fed.Reg. 9500 (1946) (interpretive opinion by FSLIC Legal Department):

Ownership, as so determined [by State law], will control the settlement of insurance pursuant to [the NHA] ... [O]ne

---

**4.** The regulations do not resolve the question of how this insurance is to be apportioned among multiple depositors in the event that deposits place in a failed bank through a single deposit broker exceed the $100,000 ceiling.

**5.** Resolution of these issues does not, of course, involve review of the agencies' determination that the practice of brokering deposits poses a threat to the insurance funds which should be eliminated, and the Court accepts this conclusion as correct in the discussion which follows.

**6.** Under 12 U.S.C. § 1822(c), the FDIC is given discretion regarding deposits whose beneficial owner is not disclosed to the bank. Regulations currently in effect grant coverage to undisclosed owners of deposits placed by an agent or custodian if the bank's records indicate that the deposit is held in such a capacity and if the agent or custodian itself maintains records of ownership in the regular course of business. *See* 12 C.F.R. 330.1(b)(2); 12 C.F.R. 564.2(b)(2).

trustee may, therefore, hold as trustee any number of insured accounts for any number of disclosed beneficiaries provided the accounts of such beneficiaries are carried separately.

*See also* 32 Fed.Reg. 10,408 (1967) (FDIC); 32 Fed.Reg. 10,416 (1967) (FSLIC):

> *Accounts held by agents or nominees.* Funds owned by a principal and deposited in one or more deposit accounts in the name or names of agents or nominees shall be added to any individual deposit accounts of the principal and insured up to $15,000 [then the statutory ceiling] in the aggregate.

█ It is clear, therefore, that the statutes were intended to grant to *each* depositor federal deposit insurance up to the statutory ceiling regardless of the means by which that depositor placed his funds in an insured institution. The statutes, quite simply, do not take into account the manner in which deposit of the funds is arranged; they focus instead on who owns the funds.

The FDIC and the Bank Board argue, however, that the FDIA and the NHA give them the authority to deviate from the principle that each depositor is entitled to the full benefits of deposit insurance. They cite several provisions in support of this argument;[7] primary reliance, however, is placed on amendments to the FDIA and the NHA adopted by Congress in 1966 which granted to each agency the authority to "define, with such classifications and exceptions as it may prescribe, terms used" in certain sections of the statute "[f]or the purpose of clarifying and defining the insurance coverage under" those statutes. Financial Institutions Supervisory Act of 1966, Pub.L. No. 91-151, 83 Stat. 371

(1966), *amending* 12 U.S.C. §§ 1728(a), 1813(m).

█ As the legislative history of this section of the 1966 Act makes clear, however, it was not intended to provide the FDIC and the Bank Board with any broad new grant of power. The language at issue here was offered as a floor amendment by Congressman Ashley and Senator Robertson. As their comments upon introducing the amendment make clear, it was simply intended to give the agencies additional tools necessary to prevent a *single* depositor from exceeding the statutory ceiling through ingenious means.

> Both [the FDIC and FSLIC] have felt the need for action to make insurance coverage more explicit, and they have been working together in recent months to arrive at uniform positions on the extent and limits of insurance coverage. The two agencies have stated that these provisions would be extremely helpful to them.

> ... [This authority] would enable the insuring agencies to bar the use of devices such as numerous joint accounts in various combinations, multiple numbered accounts, or revocable trust accounts to obtain insurance far in excess of the limits established by Congress. With the increase in insurance coverage to $15,000 effected by this bill, the savings of the small saver or typical household can be adequately protected without permitting the use of a variety of forms of account-holding aimed primarily at increasing insurance coverage still further.

112 Cong.Rec. 26,472-73 (1966) (statement of Senator Robertson). *See also* 112 Cong. Rec. 25,007 (1966) (statement of Congress-

---

**7.** Among these are 12 U.S.C. § 1819, which grants the FDIC the power "to prescribe ... such rules and regulations as it may deem necessary to carry out the provisions of this Act," and 12 U.S.C. §§ 1730 and 1818, which grant each agency the power to prevent "unsafe and unsound" banking practices. A general rule-making provision, however, obviously grants no authority to contravene the statute itself; if Congress has determined an issue, the agency is not free to change it. The "unsafe and unsound

practices" provisions likewise do not support the challenged regulations. Those statutory provisions relate to specific enforcement actions brought against individual banks, and the power to prescribe regulations which "effectuate the purposes" of those provisions clearly does not contemplate across-the-board regulations of the type at issue here. Moreover, the "unsafe and unsound practices" authority do not apply to all institutions insured by the FDIC and the FSLIC, as the deposit broker regulations purport to do.

man Ashley) ("[T]he purpose of my amendment is to clarify the power of the insuring agencies to prevent the circumvention of the insurance limit by the device of multiple accounts in the same institution.").

The deposit insurance statutes always limited coverage for any one depositor to the statutory ceiling. The "technical and clarifying"[8] amendment passed in 1966 was necessary to enable the agencies to do this job fully. The amendment thus reinforced, rather than undermined, the basic principle of the statute that "the substance of beneficial ownership and not the particular legal form of the account should control." Scott, *Some Answers to Account Insurance Problems*, 23 Bus. Lawyer 493, 504 (1968) (discussing 1966 legislation). They did not, however, allow the agencies to alter the basic right of each depositor to insurance *up to* the statutory ceiling, regardless of the means through which the account was obtained. The grant of authority to "clarify and define" the insurance coverage provided by the statutes was not a grant to the FDIC and the Bank Board of authority to eliminate such a basic part of the statutes.

■ The deposit broker regulations violate this central feature of the deposit insurance statutes by depriving individual depositors of the full measure of insurance protection mandated by the statute if they place their deposits through deposit brokers. Where, as here, there is no grant of authority from Congress for the agencies to change this basic principle, the regulations are thus inconsistent with the statute and therefore not lawful.[9]

■ When a court is confronted with a clear need for regulatory action under a statute which did not anticipate the condition which created the regulatory problem or provide the means for dealing with it, there is a temptation to approve good-faith agency efforts despite the agency's apparent lack of statutory authority. But this temptation must be avoided, for it is the Congress, not the judiciary, which must act to provide the regulatory agencies with the tools they require. The Court "is neither empowered to rewrite the language of statutes which may be antiquated in dealing with the most recent technological advances, nor [is it] empowered to make a policy judgment as to whether [the regulations are] in the overall public interest. Therefore, [the Court has] no option but to set aside the regulations ... as being in violation of the statute." *American Bankers Association v. Connell*, 686 F.2d 953 (D.C.Cir.1979). Accordingly, an Order granting summary judgment to plaintiffs and setting aside the challenged regulations is filed herewith.

---

**8.** H.R.Rep. No. 2232, 89th Cong., 2d Sess. 3–4 (1966), U.S.Code Cong. & Admin.News 1966, p. 3532 (Conference Report).

**9.** In light of this conclusion, plaintiffs' argument that the regulations were not promulgated in accord with the strictures of the Administrative Procedure Act need not be reached.