# FEDERAL DEPOSIT INSURANCE CORPORATION *v.* PHILADELPHIA GEAR CORP.

No. 84–1972.   Argued March 4, 1986—Decided May 27, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, POWELL, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 440.

*Charles A. Rothfeld* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Wallace,* and *John C. Murphy, Jr.*

*Gerald F. Slattery, Jr.,* argued the cause and filed a brief for respondent.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari to consider whether a standby letter of credit backed by a contingent promissory note is insured as a "deposit" under the federal deposit insurance program. We hold that, in light of the longstanding interpretation of petitioner Federal Deposit Insurance Corporation (FDIC) that such a letter does not create a deposit and, in light of the fact that such a letter does not entrust any noncontingent assets to the bank, a standby letter of credit backed by a contingent promissory note does not give rise to an insured deposit.

I

Orion Manufacturing Corporation (Orion) was, at the time of the relevant transactions, a customer of respondent Phila-

---

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *John L. Warden* and *Stanley F. Farrar;* for the Council on International Banking, Inc., by *Bud G. Holman;* for the National Association of Bond Lawyers by *Daniel O. Mahoney;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon* and *Joyce Holmes Benjamin.*

*George W. Miller* and *Dennis J. Lehr* filed a brief for William H. Allen et al. as *amici curiae* urging affirmance.

delphia Gear Corporation (Philadelphia Gear). On Orion's application, the Penn Square Bank, N. A. (Penn Square) issued a letter of credit for the benefit of Philadelphia Gear in the amount of $145,200. The letter of credit provided that a draft drawn upon the letter of credit would be honored by Penn Square only if accompanied by Philadelphia Gear's "signed statement that [it had] invoiced Orion Manufacturing Corporation and that said invoices have remained unpaid for at least fifteen (15) days." App. 25. Because the letter of credit was intended to provide payment to the seller only if the buyer of the invoiced goods failed to make payment, the letter of credit was what is commonly referred to as a "standby" or "guaranty" letter of credit. See, e. g., 12 CFR § 337.2(a), and n. 1 (1985) (defining standby letters of credit and mentioning that they may "'guaranty' payment of a money obligation"). A conventional "commercial" letter of credit, in contrast, is one in which the seller obtains payment from the issuing bank without looking to the buyer for payment even in the first instance. See ibid. (distinguishing standby letters of credit from commercial letters of credit). See also Verkuil, Bank Solvency and Guaranty Letters of Credit, 25 Stan. L. Rev. 716, 717–724 (1973); Arnold & Bransilver, The Standby Letter of Credit—The Controversy Continues, 10 U.C.C.L.J. 272, 277–279 (Spring 1978).

On the same day that Penn Square issued the standby letter of credit, Orion executed an unsecured promissory note for $145,200 in favor of Penn Square. App. 27. The purpose of the note was listed as "Back up Letter of Credit." Ibid. Although the face of the note did not so indicate, both Orion and Penn Square understood that nothing would be considered due on the note, and no interest charged by Penn Square, unless Philadelphia Gear presented drafts on the standby letter of credit after nonpayment by Orion. 751 F. 2d 1131, 1134 (CA10 1984). See also Tr. of Oral Arg. 32.

On July 5, 1982, Penn Square was declared insolvent. Petitioner FDIC was appointed its receiver. Shortly there-

after, Philadelphia Gear presented drafts on the standby letter of credit for payment of over $700,000 for goods delivered before Penn Square's insolvency. The FDIC returned the drafts unpaid. 751 F. 2d., at 1133–1134.

Philadelphia Gear sued the FDIC in the Western District of Oklahoma. Philadelphia Gear alleged that the standby letter of credit was an insured deposit under the definition of "deposit" set forth at 12 U. S. C. § 1813(*l*)(1), and that Philadelphia Gear was therefore entitled to $100,000 in deposit insurance from the FDIC. See 12 U. S. C. § 1821(a)(1) (setting forth $100,000 as the maximum amount generally insured by the FDIC for any single depositor at a given bank). In apparent hopes of obtaining additional funds from the FDIC in the latter's capacity as receiver rather than as insurer, respondent also alleged that terms of the standby letter of credit allowing repeated reinstatements of the credit made the letter's total value more than $145,200.

The District Court held that the total value of the standby letter of credit was $145,200, App. B to Pet. for Cert. 20a, 28a–30a; that the letter was an insured deposit on which the FDIC was liable for $100,000 in deposit insurance, *id.*, at 37a–43a; and that Philadelphia Gear was entitled to prejudgment interest on that $100,000, *id.*, at 43a. The FDIC appealed from the District Court's ruling that the standby letter of credit backed by a contingent promissory note constituted a "deposit" for purposes of 12 U. S. C. § 1813(*l*)(1) and its ruling that Philadelphia Gear was entitled to an award of prejudgment interest. Philadelphia Gear cross-appealed from the District Court's ruling on the total value of the letter of credit.

The Court of Appeals for the Tenth Circuit reversed the District Court's award of prejudgment interest, 751 F. 2d, at 1138–1139, but otherwise affirmed the District Court's decision. As to the definition of "deposit," the Court of Appeals held that a standby letter of credit backed by a promissory note fell within the terms of 12 U. S. C. § 1813(*l*)(1)'s defini-

tion of "deposit," and was therefore insured. *Id.*, at 1134–1138. We granted the FDIC's petition for certiorari on this aspect of the Court of Appeals' ruling. 474 U. S. 918 (1985). We now reverse.

## II

Title 12 U. S. C. § 1813(*l*)(1) provides:

> "The term 'deposit' means —
>
> "(1) the unpaid balance of money or its equivalent received or held by a bank in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial . . . account, or which is evidenced by . . . a letter of credit or a traveler's check on which the bank is primarily liable: *Provided*, That, without limiting the generality of the term 'money or its equivalent,' any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable . . . ."

Philadelphia Gear successfully argued before the Court of Appeals that the standby letter of credit backed by a contingent promissory note constituted a "deposit" under 12 U. S. C. § 1813(*l*)(1) because that letter was one on which the bank was primarily liable, and evidenced the receipt by the bank of "money or its equivalent" in the form of a promissory note upon which the person obtaining the credit was primarily or secondarily liable. The FDIC does not here dispute that the bank was primarily liable on the letter of credit. Brief for Petitioner 7, n. 7. Nor does the FDIC contest the fact that the backup note executed by Orion is, at least in some sense, a "promissory note." See Tr. of Oral Arg. 7 (remarks of Mr. Rothfeld, representing the FDIC) ("It was labeled a note. It can be termed a note"). The FDIC argues rather that it has consistently interpreted § 1813(*l*)(1) not to

include standby letters of credit backed only by a contingent promissory note because such a note represents no hard assets and thus does not constitute "money or its equivalent." Because the alleged "deposit" consists only of a *contingent* liability, asserts the FDIC, a standby letter of credit backed by a contingent promissory note does not give rise to a "deposit" that Congress intended the FDIC to insure. Under this theory, while the note here may have been labeled a promissory note on its face and may have been a promissory note under state law, it was not a promissory note for purposes of the federal law set forth in 12 U. S. C. § 1813(*l*)(1). See *D'Oench, Duhme & Co.* v. *FDIC*, 315 U. S. 447, 456 (1942) (holding that liability on a promissory note acquired by the FDIC is a federal question); *First National Bank* v. *Dickinson*, 396 U. S. 122, 133–134 (1969) (holding that federal law governs the definition of branch banking under the McFadden Act).

The Court of Appeals quite properly looked first to the language of the statute. See *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 735 (1985); *United States* v. *Yermian*, 468 U. S. 63, 68 (1984). Finding the language of the proviso in § 1813(*l*)(1) sufficiently plain, the Court of Appeals looked no further. But as the FDIC points out, the terms "letter of credit" and "promissory note" as used in the statute have a federal definition, and the FDIC has developed and interpreted those definitions for many years within the framework of the complex statutory scheme that the FDIC administers. The FDIC's interpretation of whether a standby letter of credit backed by a contingent promissory note constitutes a "deposit" is consistent with Congress' desire to protect the hard earnings of individuals by providing for federal deposit insurance. Since the creation of the FDIC, Congress has expressed no dissatisfaction with the FDIC's interpretation of "deposit"; indeed, Congress in 1960 adopted the FDIC's regulatory definition as the statutory language. When we weigh all these factors together, we are

constrained to conclude that the term "deposit" does not include a standby letter of credit backed by a contingent promissory note.

A

Justice Holmes stated that, as to discerning the constitutionality of a federal estate tax, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921). Although the genesis of the Federal Deposit Insurance Act may not be quite so powerful a substitute for legal analysis, that history is worthy of at least a page of recounting for the light it sheds on Congress' purpose in passing the Act. Cf. *Watt* v. *Alaska*, 451 U. S. 259, 266 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect").

When Congress created the FDIC, the Nation was in the throes of an extraordinary financial crisis. See generally F. Allen, Since Yesterday: The Nineteen-Thirties in America 98–121 (1940); A. Schlesinger, The Crisis of the Old Order 474–482 (1957). More than one-third of the banks in the United States open in 1929 had shut their doors just four years later. Bureau of the Census, Historical Statistics of the United States: Colonial Times to 1970, pt. 2, pp. 1019, 1038 (1976). In response to this financial crisis, President Roosevelt declared a national banking holiday effective the first business day after he took office. 48 Stat. 1689. Congress in turn responded with extensive legislation on banking, including the laws that gave the FDIC its existence.

Congress' purpose in creating the FDIC was clear. Faced with virtual panic, Congress attempted to safeguard the hard earnings of individuals against the possibility that bank failures would deprive them of their savings. Congress passed the 1933 provisions "[i]n order to provide against a repetition of the present painful experience in which a vast sum of *assets and purchasing power* is 'tied up.'" S. Rep. No. 77, 73d Cong., 1st Sess., 12 (1933) (emphasis added). The

focus of Congress was therefore upon ensuring that a deposit of "hard earnings" entrusted by individuals to a bank would not lead to a tangible loss in the event of a bank failure. As the chairman of the relevant Committee in the House of Representatives explained on the floor:

> "[T]he purpose of this legislation is to protect the people of the United States in the right to have banks in which their deposits will be safe. They have a right to expect of Congress the establishment and maintenance of a system of banks in the United States where citizens may place their hard earnings with reasonable expectation of being able to get them out again upon demand. . . .
>
> .  .  .  .  .
>
> "[The purpose of the bill is to ensure that] the community is saved from the shock of a bank failure, and every citizen has been given an opportunity to withdraw his deposits. . . .
>
> .  .  .  .  .
>
> "The public . . . demand of you and me that we provide a banking system worthy of this great Nation and banks in which citizens may place the fruits of their toil and know that a deposit slip in return for their hard earnings will be as safe as a Government bond." 77 Cong. Rec. 3837, 3838, 3840 (1933) (remarks of Rep. Steagall).

See also *id.*, at 3913 (remarks of Rep. Keller) ("[We must make] it absolutely certain that . . . any and every man, woman, or child who puts a dollar in any bank can absolutely know that he will under no circumstances lose a single penny of it"); *id.*, at 3924 (remarks of Rep. Green) ("It is time that we pass a law so secure that when a man puts his money in a bank he will know for sure that when he comes back it will be there"). To prevent bank failure that resulted in the tangible loss of hard assets was therefore the focus of Congress' effort in creating deposit insurance.

Despite the fact Congress revisited the deposit insurance statute in 1935, 1950, and 1960, these comments remain the

best indication of Congress' underlying purpose in creating deposit insurance. The Reports on the 1935 amendments presented the definition of "deposit" without any specific comment. See H. R. Rep. No. 742, 74th Cong., 1st Sess., 2 (1935); S. Rep. No. 1007, 74th Cong., 1st Sess., 2–4 (1935); H. R. Conf. Rep. No. 1822, 74th Cong., 1st Sess., 44 (1935). The floor debates centered around changes in the Federal Reserve System made in the same bill, not on deposit insurance. See, *e. g.*, 79 Cong. Rec. 6568–6577, 6651–6660 (1935). Indeed, in light of the fact that instruments denominated "promissory notes" seem at the time to have been considered exclusively uncontingent, see, *e. g.*, 16 Fed. Res. Bull. 520 (1930) (Regulation A) (defining promissory note as an *"unconditional* promise . . . to pay [a sum certain in dollars] at a fixed or determinable future time") (emphasis added); *Gilman* v. *Commissioner*, 53 F. 2d 47, 50 (CA8 1931) ("The form of these [contingent] instruments referred to as 'promissory notes' is very unusual"), it is unlikely that Congress would have had occasion to refer expressly to contingent notes such as the one before us here even if Congress had turned its attention to the definition of "deposit" when it first enacted the provision treating "money or its equivalent."

The legislative history of the 1950 amendments is similarly unhelpful, as one would expect given that the relevant provisions were reenacted but unchanged. See S. Rep. No. 1269, 81st Cong., 2d Sess., 2–3 (1950); H. R. Rep. No. 2564, 81st Cong., 2d Sess., 5–6 (1950). The Committee Reports on the 1960 amendments likewise give no indication that the amendments' phrasing was meant to effect any fundamental changes in the definition of deposit; those Reports state only that the changes are intended to bring into harmony the definitions of "deposit" used for purposes of deposit insurance with those used in reports of condition, and that the FDIC's rules and regulations are to be incorporated into the new definition. See H. R. Rep. No. 1827, 86th Cong., 2d Sess., 3, 5 (1960); S. Rep. No. 1821, 86th Cong., 2d Sess., 7, 10 (1960).

See also 106 Cong. Rec. 14794 (1960) (discussing pre-1960 scheme).

Congress' focus in providing for a system of deposit insurance—a system that has been continued to the present without modification to the basic definition of deposits that are "money or its equivalent"—was clearly a focus upon safeguarding the assets and "hard earnings" that businesses and individuals have entrusted to banks. Congress wanted to ensure that someone who put tangible assets into a bank could always get those assets back. The purpose behind the insurance of deposits in general, and especially in the section defining deposits as "money or its equivalent," therefore, is the protection of assets and hard earnings entrusted to a bank.

This purpose is not furthered by extending deposit insurance to cover a standby letter of credit backed by a contingent promissory note, which involves no such surrender of assets or hard earnings to the custody of the bank. Philadelphia Gear, which now seeks to collect deposit insurance, surrendered absolutely nothing to the bank. The letter of credit is for Philadelphia Gear's benefit, but the bank relied upon Orion to meet the obligations of the letter of credit and made no demands upon Philadelphia Gear. Nor, more importantly, did Orion surrender any assets unconditionally to the bank. The bank did not credit any account of Orion's in exchange for the promissory note, and did not treat its own assets as increased by its acceptance of the note. The bank could not have collected on the note from Orion unless Philadelphia Gear presented the unpaid invoices and a draft on the letter of credit. In the absence of a presentation by Philadelphia Gear of the unpaid invoices, the promissory note was a wholly contingent promise, and when Penn Square went into receivership, neither Orion nor Philadelphia Gear had lost anything except the ability to use Penn Square to reduce Philadelphia Gear's risk that Philadelphia Gear would go unpaid for a delivery of goods to Orion.

B

Congress' actions with respect to the particular definition of "deposit" that it has chosen in order to effect its general purpose likewise lead us to believe that a standby letter of credit backed by a contingent promissory note is not an insurable "deposit." In 1933, Congress amended the Federal Reserve Act to authorize the creation of the FDIC and charged it "to insure . . . the deposits of all banks which are entitled to the benefits of [FDIC] insurance." § 8, Banking Act of 1933, ch. 89, 48 Stat. 168. Congress did not define the term "deposit," however, until the Banking Act of 1935, in which it stated:

> "The term 'deposit' means the unpaid balance of money or its equivalent received by a bank in the usual course of business and for which it has given or is obligated to give credit to a commercial, checking, savings, time or thrift account, or which is evidenced by its certificate of deposit, and trust funds held by such bank whether retained or deposited in any department of such bank or deposited in another bank, together with such other obligations of a bank as the board of directors [of the FDIC] shall find and shall prescribe by its regulations to be deposit liabilities by. general usage . . . ." § 101, Banking Act of 1935, ch. 614, 49 Stat. 684, 685–686.

Less than two months after this statute was enacted, the FDIC promulgated a definition of "deposit," which provided in part that "letters of credit must be regarded as issued for the equivalent of money when issued in exchange for . . . promissory notes upon which the person procuring [such] instruments is primarily or secondarily liable." See 12 CFR § 301.1(d) (1939) (codifying Regulation I, rule 1, Oct. 1, 1935), revoked after incorporation into statutory law, 12 CFR 234 (Supp. 1962).

In 1950, Congress revisited the provisions specifically governing the FDIC in order to remove them from the Federal

Reserve Act and place them into a separate Act. See Act of Sept. 21, 1950, ch. 967, 64 Stat. 874. The new provisions did not modify the definition of "deposit." In 1960, Congress expanded the statutory definition of "deposit" in several categories, and also incorporated the regulatory definition that the FDIC had employed since 1935 into the statute that remains in force today. See *supra*, at 430 (quoting current version of statute).

At no point did Congress disown its initial, clear desire to protect the hard assets of depositors. See *supra*, at 432–435. At no point did Congress criticize the FDIC's longstanding interpretation, see *infra*, at 438, that a standby letter of credit backed by a contingent promissory note is not a "deposit." In fact, Congress had reenacted the 1935 provisions in 1950 without changing the definition of "deposit" at all. Compare 49 Stat. 685–686 with 64 Stat. 874–875. When the statute giving rise to the longstanding interpretation has been reenacted without pertinent change, the "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *NLRB* v. *Bell Aerospace*, 416 U. S. 267, 275 (1974). See *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 457 (1978). Indeed, the current statutory definition of "deposit," added by Congress in 1960, was expressly designed to incorporate the FDIC's rules and regulations on "deposits." As Committees of both Houses of Congress explained the amendments: "The amended definition would include the present statutory definition of deposits, *and the definition of deposits in the rules and regulations of the Federal Deposit Insurance Corporation,* [along] with . . . changes [in sections other than what is now § 1813(*l*)(1)]." H. R. Rep. No. 1827, 86th Cong., 2d Sess., 5 (1960) (emphasis added); S. Rep. No. 1821, 86th Cong., 2d Sess., 10 (1960) (same). Congress, therefore, has expressly incorporated into the statutory scheme the regulations that the FDIC devised to assist it in determining what constitutes a "deposit"

within the statutory scheme. Under these circumstances, we must obviously give a great deal of deference to the FDIC's interpretation of what these regulations do and do not include within their definition of "deposit."

C

Although the FDIC does not argue that it has an express regulation excluding a standby letter of credit backed by a contingent promissory note from the definition of "deposit" in 12 U. S. C. § 1813(*l*)(1), that exclusion by the FDIC is nonetheless longstanding and consistent. At a meeting of FDIC and bank officials shortly after the FDIC's creation, a bank official asked whether a letter of credit issued by a charge against a customer's account was a deposit. The FDIC official replied:

> "'If your letter of credit is issued by a charge against a depositor's account or for cash and the letter of credit is reflected on your books as a liability, you do have a deposit liability. If, on the other hand, you merely extend a line of credit to your customer, you will only show a contingent liability on your books. In that event no deposit liability has been created.'" Transcript as quoted in *FDIC* v. *Irving Trust Co.*, 137 F. Supp. 145, 161 (SDNY 1955).

Because Penn Square apparently never reflected the letter of credit here as a noncontingent liability, and because the interwoven financial instruments at issue here can be viewed most accurately as the extension of a line of credit by Penn Square to Orion, this transcript lends support to the FDIC's contention that its longstanding policy has been to exclude standby letters of credit backed by contingent promissory notes from 12 U. S. C. § 1813(*l*)(1)'s definition of "deposit."

The FDIC's contemporaneous understanding that standby letters of credit backed by contingent promissory notes do not generate a "deposit" for purposes of 12 U. S. C. § 1813(*l*)(1) has been fortified by its behavior over the follow-

ing decades. The FDIC has asserted repeatedly that it has never charged deposit insurance premiums on standby letters of credit backed by contingent promissory notes, and Philadelphia Gear does not contest that assertion. See Tr. of Oral Arg. 42. Congress requires the FDIC to assess contributions to its insurance fund at a fixed percentage of a bank's "deposits" under 12 U. S. C. § 1813(*l*)(1). See 12 U. S. C. §§ 1817(a)(4), (b)(1), (b)(4)(A). By the time that this suit — the first challenge to the FDIC's treatment of standby letters of credit backed by contingent promissory notes — was brought, almost $100 billion in standby letters of credit was outstanding. See Board of Governors of the Federal Reserve System, Annual Statistical Digest 71 (1983); FDIC, 1983 Statistics on Banking (Table 110F). The FDIC's failure to levy premiums on standby letters of credit backed by contingent promissory notes therefore clearly demonstrates that the FDIC has never considered such letters to reflect deposits.

Although the FDIC's interpretation of the relevant statute has not been reduced to a specific regulation, we conclude nevertheless that the FDIC's practice and belief that a standby letter of credit backed by a contingent promissory note does not create a "deposit" within the meaning of 12 U. S. C. § 1813(*l*)(1) are entitled in the circumstances of this case to the "considerable weight [that] should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). As we have stated above, the FDIC's interpretation here of a statutory definition adopted wholesale from the FDIC's own regulation is consistent with congressional purpose, and may certainly stand.

## III

Philadelphia Gear essentially seeks to have the FDIC guarantee the contingent credit extended to Orion, not assets en-

trusted to the bank by Philadelphia Gear or by Orion on Philadelphia Gear's behalf. With a standard "commercial" letter of credit, Orion would typically have unconditionally entrusted Penn Square with funds before Penn Square would have written the letter of credit, and thus Orion would have lost something if Penn Square became unable to honor its obligations. As the FDIC concedes, deposit insurance extends to such a letter of credit backed by an uncontingent promissory note. See Tr. of Oral Arg. 8 (statement of Mr. Rothfeld, representing the FDIC) ("If this note were a fully uncontingent negotiable note that were not limited by any side agreements, it would be a note backing a letter of credit within the meaning of the statute"). See also *id.*, at 17–18. But here, with a standby letter of credit backed by a contingent promissory note, Penn Square was not in possession of any of Orion's or Philadelphia Gear's assets when it went into receivership. Nothing was ventured, and therefore no insurable deposit was lost. We believe that, whatever the relevant State's definition of "letter of credit" or "promissory note," Congress did not by using those phrases in 12 U. S. C. § 1813(*l*)(1) intend to protect with deposit insurance a standby letter of credit backed only by a contingent promissory note. We thus hold that such an arrangement does not give rise to a "deposit" under 12 U. S. C. § 1813(*l*)(1).

Accordingly, the judgment of the court below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN and JUSTICE REHNQUIST join, dissenting.

There is considerable common sense backing the Court's opinion. The standby letter of credit in this case differs considerably from the savings and checking accounts that come most readily to mind when one speaks of an insured deposit. Nevertheless, to reach this common-sense result, the Court must read qualifications into the statute that do not appear

there.   We recently recognized that even when the ingenuity of businessmen creates transactions and corporate forms that were perhaps not contemplated by Congress, the courts must enforce the statutes that Congress has enacted.   See *Board of Governors, FRS* v. *Dimension Financial Corp.*, 474 U. S. 361, 373–375 (1986).   Congress unmistakably provided that letters of credit backed by promissory notes constitute "deposits" for purposes of the federal deposit insurance program, and the Court's attempt to draw distinctions between different types of letter of credit transactions forces it to ignore both the statute and some settled principles of commercial law.   Here, as in *Dimension*, the inflexibility of the statute as applied to modern financial transactions is a matter for Congress, not the FDIC or this Court, to remedy.

It cannot be doubted that the standby letter of credit in this case meets the literal definition of a "deposit" contained in 12 U. S. C. § 1813(*l*)(1).   It is "a letter of credit . . . on which the bank is primarily liable . . . issued in exchange for . . . a promissory note upon which [Orion] is primarily or secondarily liable."   The Court, however, holds that the note in this case, whether or not it is a promissory note under the Uniform Commercial Code (UCC) and Oklahoma law, is not a promissory note for purposes of the Federal Deposit Insurance Act.   We should assume, absent convincing evidence to the contrary, that Congress intended for the term "promissory note" to derive its meaning from the ordinary sources of commercial law.   I believe that there is no such evidence in this case.

The Court justifies its restrictive reading of the term "promissory note" in large part by arguing that Congress would not have wanted to include in that term any obligation that was not the present equivalent of money.   The keystone of the FDIC's arguments, and of the Court's decision, is that Orion did not entrust "money or its equivalent" to the bank. The note in this case, however, was the equivalent of money,

and the Court's reading of Congress' intent is therefore largely irrelevant.

FDIC concedes, as it must, that Congress has determined that a promissory note generally constitutes money or its equivalent. Moreover, that statutory definition comports with economic reality. Promissory notes typically are negotiable instruments and therefore readily convertible into cash. The FDIC argues, and the Court holds, that the promissory note in this case is "contingent" and therefore not the equivalent of money. However, while the FDIC argues strenuously that Orion's note is not a promissory note in the usual sense of the word, one could more plausibly state that it is not a "contingent" obligation in the usual sense of that word. On its face the note is an unconditional obligation of Orion to pay the holder $145,200 plus accrued interest on August 1, 1982. It sets out no conditions that would affect the negotiability of the note, and therefore is fully negotiable for purposes of the UCC, U.C.C. § 3–104(1) (1977); Okla. Stat., Tit. 12A, § 3–104(1) (1981).

The Court therefore misses the point when it states that at the time of the original banking Acts, the term "promissory note" was not understood to include a contingent obligation. *Ante*, at 434. The note at issue in this case is an unconditional promise to pay, and satisfies all the requisites of a negotiable promissory note, either under the UCC or the common law as it existed in the 1930's. The only contingencies attached to Orion's obligation arise out of a separate contract. As to such contingencies, the law was well settled long before 1930:

> "[I]n order to make a note invalid as a promissory note, the contingency to avoid it must be apparent, either upon the face of the note, or upon some contemporaneous written memorandum on the same paper; for, if the memorandum is not contemporaneous, or if it be merely verbal in each case, whatever may be its effect as a matter of defence between the original parties, it is not deemed to be a part of the instrument, and does not af-

fect, much less invalidate, its original character." J. Thorndike, Story on Promissory Notes 34 (7th ed. 1878) (footnotes omitted).[1]

It is far from a matter of semantics to state that while Orion and the bank may have an oral understanding concerning the bank's treatment of Orion's note, that note itself is unconditional and equivalent to money. The Court correctly observes that the bank would have breached its oral contract had it attempted to sue on the note; nevertheless, Orion would have had separately to plead and prove a breach of contract in that case, because parol evidence that the contract between the parties differed from the written instrument would have been inadmissible in the bank's action to collect the debt. See *American Perforating Co.* v. *Oklahoma State Bank*, 463 P. 2d 958, 962–963 (Okla. 1970). Similarly, should the note have found its way into the hands of a third party, Orion would have had no choice but to honor it, again being left with only the right to sue the bank for breach of the oral contract. Orion's entrustment of the note to the bank was not, therefore, completely risk free.

The risk taken on by Orion may not differ substantially from the risk assumed by one who hands over money to the bank to guarantee repayment of funds paid out on a letter of credit. The bank typically undertakes to put such cash collateral into a special account, where it never enters into the general assets of the bank. See U.C.C. §5–117, comment (1977). Should the bank cease operations, the customer will enjoy a preference in bankruptcy, entitling it to receive its money back before general unsecured creditors of the bank

---

[1] We would have a very different case if the conditions put upon Orion's obligation to the bank were reflected on the face of the note, as they were in *Allen* v. *FDIC*, 599 F. Supp. 104 (ED Tenn. 1984), appeal pending, No. 85–5003 (CA6), a case raising the same issue as the present one. Because such a note is not negotiable, it is much more plausible to argue that Congress would not have considered it "money or its equivalent." The note in this case, however, is in no sense a contingent note.

are paid. U.C.C. § 5–117; Okla. Stat., Tit. 12A, § 5–117 (1981). Like Orion, then, that hypothetical customer has little to fear absent misconduct by the bank or a third party. If the federal deposit insurance program should not protect Philadelphia Gear, therefore, it probably should not protect *any* holder of a letter of credit, whether commercial, standby, funded, or unfunded.[2] That, however, is clearly a matter for Congress to determine.

While the Court purports to examine what Congress meant when it said "promissory note," in fact the Court's opinion does not rest on any special attributes of Orion's note. Rather, the Court rules that when an individual entrusts a negotiable instrument to a bank, that instrument is not "money or its equivalent" for purposes of § 1813(*l*)(1) so long as the bank promises not to negotiate it or collect on it until certain conditions are met. That is a proviso that Congress might have been well advised to include in the Act, but did not. I therefore dissent.

---

[2] It seems odd that Philadelphia Gear's status as an insured depositor should depend on the terms of the repayment agreement between Orion and the bank. Ordinarily, Philadelphia Gear would be indifferent to the agreement between Orion and the bank, and might not even be aware of the terms of that agreement. The Court, therefore, is not necessarily bringing greater rationality to this area of the law by creating distinctions between types of letters of credit for purposes of federal deposit insurance coverage.