United States Court of Appeals,

Fifth Circuit.

No. 90–7090.

CITY OF ARLINGTON, TEXAS, a Municipal Corporation, Plaintiff–Appellee,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Defendants,

First Gibraltar Bank, FSB, Defendant–Appellant.

June 17, 1992.

Appeals from the United States District Court For the Northern District of Texas.

Before POLITZ, Chief Judge, BROWN, Circuit Judge, and FELDMAN,[*] District Judge.


POLITZ, Chief Judge:

First Gibraltar Bank, NSB, appeals a summary judgment ordering it to establish and fund an account in the amount of $2,100,000 plus interest in favor of the City of Arlington, Texas. Gibraltar also appeals the denial of its motion for summary judgment. For the reasons stated herein we reverse the summary judgment against Gibraltar and render summary judgment in its favor.


Background

In 1985 First Texas Savings Association, a state chartered savings and loan association, entered into a loan agreement with Shady Valley West Joint Venture,[1] agreeing to loan the venture up to $29,620,000 for acquisition and improvement of certain real property located in Arlington, Texas. First Texas required Shady Valley to post an irrevocable letter of credit in the amount of $4,100,000 to assure the availability of sufficient funds to construct Green Oaks Boulevard on the property. In June 1986 Shady Valley and First Texas entered into a letter agreement which modified

---

[*]District Judge for the Eastern District of Louisiana, sitting by designation.

[1]A more complete recitation of the facts underlying the instant appeal are found in the district court decision. *City of Arlington v. Federal Deposit Ins. Corp.,* 752 F.Supp. 219 (N.D.Tex.1990).

the terms of the loan agreement to provide, *inter alia,* that First Texas would hold the sum of $2,300,000 "for the construction costs relating to Green Oaks Boulevard."

By agreement First Texas then made a $2,697,993.70 draw on the letter of credit. First Texas deposited that sum into an account styled "FTSA Tr for Shady Valley J.V."[2] (the "Account"). In September 1986 First Texas and Shady Valley modified the terms of the Account agreement to permit the withdrawal of all sums in excess of $2,100,000 on the condition that the remaining Account funds would secure payment of the loan. The modification agreement acknowledged that the amount remaining in the Account is "currently held by [First Texas] ... as security." The modification agreement provided that if no default occurred under any of the loan documents, then the remaining amounts in the Account would be utilized to construct Green Oaks Boulevard. At or about the same time Shady Valley, First Texas, and Arlington entered into an escrow agreement which set forth the obligations with respect to the construction of Green Oaks Boulevard. This agreement was signed a few days after the execution of the modification agreement between Shady Valley and First Texas.[3] First Texas maintained the escrow agreement in its real estate loan files, not in its deposit records.

The instant controversy arises out of the provisions of the escrow agreement which provided, in relevant part, that (1) upon execution of the escrow agreement First Texas would place the sum of $2,100,000 in a separate interest-bearing account designated as "Escrow Account–Arlington" to be used to complete the Green Oaks Boulevard project, and (2) if Shady Valley failed to commence construction of the project within one month, or failed to complete the project within 180 working days, Arlington had the option to hire a contractor to complete the project. After the escrow agreement was signed, a First Texas officer told the Arlington city attorney that the Arlington escrow account had been established, although in fact it had not been. Subsequently, Shady Valley defaulted

---

[2]First Texas Savings Association as Trustee for Shady Valley Joint Venture.

[3]After signing the escrow agreement First Texas discovered that shortly before Arlington had paid Shady Valley $1,500,000 as a part of a "settlement agreement."

on its loan obligations and in April 1987 First Texas closed the Account after offsetting its balance against Shady Valley's loan. When Arlington discovered the offset the following month, it demanded that First Texas reinstate the Account. When First Texas refused, Arlington filed suit in state court alleging tort and breach of contract claims.

In December 1988, 20 months after the Account offset, the Federal Home Loan Bank Board declared First Texas to be insolvent and appointed the FSLIC as receiver. Thereafter, Gibraltar executed a purchase and assumption agreement with the FSLIC in which Gibraltar assumed certain First Texas assets and liabilities including liabilities to secured creditors, taxing authorities, and depositors. Gibraltar expressly assumed and agreed to pay, perform, and discharge all First Texas depositor liabilities as defined in the purchase and assumption agreement.

In January 1989 the FSLIC, in its capacity as receiver, intervened and removed the suit to federal court. In May 1989 Arlington added Gibraltar and the FSLIC, in its corporate capacity, as defendants. In May 1990 Gibraltar moved for summary judgment, urging that as a matter of law it had no liability to Arlington. In September, Arlington moved for summary judgment on the basis that Gibraltar had assumed the First Texas depositor liability to Arlington. The FDIC, in its receiver capacity and statutory successor to the FSLIC and Manager of the FSLIC Resolution Fund, likewise moved for summary judgment. Simultaneously the FDIC in its corporate capacity, as Manager of the FSLIC Resolution Fund and statutory successor to the FSLIC in its corporate capacity, also moved for summary judgment. The district court dismissed the FDIC-receiver with prejudice, granted summary judgment for Arlington, and denied summary judgment for Gibraltar.[4] The judgment, in part, ordered that Gibraltar establish and fund an account in the amount of $2,100,000 plus interest in favor of Arlington. The district court then dismissed the FDIC/Manager–Fund with prejudice and Gibraltar filed a timely notice of appeal. The FDIC participates in this appeal as an *amicus curiae*.

---

[4]The order also severed for separate trial "all claims and causes of action asserted by, and all relief sought by, plaintiff against FDIC/Manager–Fund and First Gibraltar that are not resolved by this opinion and order." The severance order was not appealed.

Analysis

The standard of review for a summary judgment is well settled: We review the record *de novo* to ascertain whether any genuine issue exists as to any material fact and, if none exists, determine whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Miles v. American Tel. & Tel. Co.,* 703 F.2d 193 (5th Cir.1983). Without weighing the evidence, assessing its probative value, or resolving any factual disputes, we search the record for resolution-determinative factual disputes and apply the law to the facts if no material disputes are found. *Kennett–Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir.1980). We review *de novo* district court conclusions of state law. *Salve Regina College v. Russell,* ⎯⎯ U.S. ⎯⎯, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

We must first determine whether Arlington was a depositor of First Texas whose liability Gibraltar subsequently assumed. The district court answered this question in the affirmative. In this the district court erred. The district court found that because First Texas had actual knowledge that the Account would be used by Arlington to pay the costs of the construction of Green Oaks Boulevard it had no right to offset the Account. *National Indemnity Co. v. Spring Branch State Bank,* 162 Tex. 521, 348 S.W.2d 528 (1961), and *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley,* 551 F.2d 1346 (5th Cir.1977), interpreting Texas law, are advanced in support of the trial court's decision. The district court concluded that "the bookkeeping offset of the Account [by First Texas] was a nullity as to City of Arlington."

*National Indemnity* and *South Central Livestock* stand for the proposition that if a bank offsets an account, the proceeds of which belong to a third person, whether the bank has knowledge of the third party ownership or not, the injured person has a cause of action in equity for wrongful offset and, in some cases, a cause of action for tortious interference with contract. The court did not order the bank to "recreate and refund" the alleged wrongfully offset account in either of these cases, nor did either court suggest that such a remedy existed. These cases merely recognized the plaintiff's

right to pursue an equitable remedy. In *South Central Livestock* we noted that a "Texas bank's power to offset is equitable in nature, and it may be overborne by superior equities.... If this causes some inconvenience, it would still seem to us preferable to a rule which would require one man to pay the debts of another without receiving any value therefor." *South Central Livestock,* 551 F.2d at 1351 (citation and internal punctuation omitted). The judgment before us turns the Texas equity principle on its head, occasioning the very result which equity abhors—one person [Gibraltar] is paying the debts of another [First Texas] without having received any value whatever.[5] We therefore conclude that these two cases provide no predicate for declaring Arlington a "depositor" of First Texas.[6]

The district court hedged its Texas law analysis with a string cite to four depression-era federal cases which purportedly stand for the proposition that a successor institution cannot avoid FDIC insurance liability when the predecessor institution's alleged wrongful acts caused the record of the depositor's account to be questioned. *Federal Deposit Ins. Corp. v. Barton,* 106 F.2d 737 (10th Cir.1939); *Federal Deposit Ins. Corp. v. Deaton,* 105 F.2d 677 (10th Cir.1939); *Federal Deposit Ins. Corp. v. Records,* 34 F.Supp. 600 (W.D.Mo.1940); and *Jones v. Federal Deposit Ins. Corp.,* 24 F.Supp. 985 (W.D.Okla.1938). These cases are inapposite. Each involves a suit against the FDIC for insurance payments and turn on factual circumstances in which an actual deposit of money was made to an account[7] and both the deposit and the account were clearly documented in the bank records. None of those factual circumstances exist in Arlington's claim nor is Arlington's claim one against the FDIC for account insurance.

---

[5]It is undisputed that Gibraltar received no payments from FSLIC representing any money related to the disputed account. The district court recognized that the "FDIC/Manager–Fund now has ownership of the real property." *City of Arlington,* 752 F.Supp. at 228.

[6]Because the FSLIC's declaration of worthlessness of First Texas has gone unchallenged, Arlington's cause of action under *National Indemnity* and *South Central Livestock* may be valueless. *See Gulley v. Sunbelt Sav., F.S.B.,* 902 F.2d 348 (5th Cir.1990). That question, however, is not before us today.

[7]For a recent affirmation of the principle that the FDIC insurance legislation is intended to protect actual money or its equivalent deposited by the claimant *see Federal Deposit Ins. Corp. v. Philadelphia Gear Corp.,* 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986).

Finally, the district court relied on FSLIC insurance settlement regulations for the proposition that a party, other than the one making an insured deposit, may be treated as the owner of that deposit. In *FAIC Securities, Inc. v. United States,* 595 F.Supp. 73 (D.D.C.1984), the court ruled that where the records of the institution show for whose benefit the account is maintained, the insurance protection cannot be withheld. *FAIC* involved a challenge to FDIC regulations that would have limited insurance payments on brokered deposit accounts. In striking down the regulations, the *FAIC* court emphasized that the ultimate concern of the insurance regulations has always been to protect the beneficial owner of the funds on deposit *when* "the ownership is reflected on the books of the bank." *FAIC,* 595 F.Supp. at 77 (emphasis ours). "The command seems to be clear ... where the records of the institution show for whose benefit the account is maintained the legal measure of insurance protection cannot be denied." *Id.* As we have stated previously, the instant case is not an FDIC insurance claim and Arlington's ownership of the funds in the Account was never noted upon the deposit records of First Texas; thus, *FAIC* also in inapposite.

We now turn to the purchase and assumption agreement itself:

Section 1(a) defines *Deposit* as "a withdrawable ... share ... or deposit in the CLOSED ASSOCIATION of a type that is ... insurable under Section 405(a) of the National Housing Act (12 U.S.C. § 1728(a) (1982)...."

Section 2 defines *Depositor* as "the holder of a Deposit in the CLOSED ASSOCIATION."

Section 3 provides in relevant part that the "ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform, and discharge (i) all of the CLOSED ASSOCIATION's liabilities to Depositors with respect to their Deposits...."

Section 5 provides in relevant part that "the RECEIVER shall furnish to the ACQUIRING ASSOCIATION upon its completion ... a record of the CLOSED ASSOCIATION's ... deposit ... liabilities that were assumed in this Agreement."

Section 7 provides that "[t]he ACQUIRING ASSOCIATION agrees to pay ... all properly drawn and presented withdrawal requests by the CLOSED ASSOCIATION's Depositors whose Deposits are assumed by the ACQUIRING ASSOCIATION pursuant to § 3.... *provided,* however, that the ACQUIRING ASSOCIATION does not assume any special or unusual duties of the CLOSED ASSOCIATION to such Depositors unless the terms of such duties are disclosed in the CLOSED ASSOCIATION's records." [Emphasis ours.]

We note at the outset that the list of depositors which the RECEIVER ultimately presented to

Gibraltar made no reference to the disputed Arlington Account.[8] That fact lends support to the conclusion that Arlington was not a depositor as that term is defined in the purchase and assumption agreement.

Arlington argues that the unambiguous meaning of sections 1, 3, and 7 of the purchase and assumption agreement is that Gibraltar assumed all First Texas' depositor liabilities without exception or qualification. Relying on its state-law-based claim that the offset, closing, and removal of the Account from the account records of First Texas could not alter its status as a depositor of First Texas, Arlington concludes that Gibraltar intended to and did, in fact, assume Arlington's depositor liability.

Taken to its logical conclusion, Arlington's theory would have Gibraltar assume liability for every depositor account transaction made by First Texas, including those which resulted in the closure and deactivation of deposit accounts. This ostensibly would reach back into the past, at least until the time of the Account offset and closure, 18 months or so prior to the purchase and assumption. Apparently Arlington considers the FSLIC inventory of deposit accounts provided to Gibraltar under the purchase and assumption agreement to be merely the baseline depositor liability that Gibraltar assumed; other "depositor" liabilities, such as Arlington's, would become exigible *seriatim* upon discovery. This interpretation of the agreement is contrary to the construction implicit in its performance by the FSLIC and Gibraltar, the parties thereto. We may give it little weight. *Mapco, Inc. v. Pioneer Corp.,* 615 F.2d 297 (5th Cir.1980) (interpreting Texas law).

To fall within the liability purview of the purchase and assumption agreement Arlington must show that it was the holder of a First Texas deposit of a type that was insurable under Section 405(a)

---

[8]It is undisputed that the audit occurred after the execution of the assumption agreement.

of the National Housing Act[9] at the time Gibraltar entered into the purchase and assumption agreement. Pursuant to its rulemaking powers, the FSLIC promulgated, at 12 C.F.R. Parts 561 and 563–564, rules which implement and define its statutory insurance obligations. The district court misapplied two related, but distinct regulations concerning insured deposit accounts. Section 564.1(a) provides that the "Corporation will promptly *determine,* from the account contracts and the books and records of the institution, or otherwise, *the insured members thereof.*" (Emphasis ours.) In the instant case the FSLIC inventory did not list Arlington as an insured member. There is no indication that Arlington challenged the inventory list.

The district court erred by employing section 564.2 to define the meaning of the phrase "from the account contracts and the books and records of the institution" as employed in section 564.1.[10] Section 564.2 contains a set of interpretative rules that speak to determination of the actual owner of a section 564.1 "insured member" account. The "account records of the insured institution" are deemed conclusive evidence as to the existence of any relationship on which a claim for insurance may be predicated. 12 C.F.R. § 564.2(b)(1). Sections 564.1 and 564.2 distinguish between insured members and amount of insurance coverage. Section 564.1 provides for the determination of the insured members of an insured institution and the balance of the insured accounts. 12 C.F.R. § 564.2(a). Section 564.2 determines the amount of insurance coverage for a section 564.1 account. 12 C.F.R. § 564.2(a). Section 564.2 defines certain permissible account-holder relationships such as trust, agency, guardians, and the like to resolve the question of whether there is $100,000 in insurance coverage or multiples of $100,000 coverage. *FAIC, supra.* Section 564.2 definitions are not applicable to the issue of the existence of an insured account or insured member. We therefore conclude that as a matter of law Arlington was not a depositor within the meaning of the purchase and assumption agreement.

---

[9]12 U.S.C. § 1728(a) (1982), repealed by Act Aug. 9, 1989, P.L. 101–73, Title 4, § 407, 103 Stat. 363.

[10]Arlington offers no support for its implied proposition that section 564.1 "records" include First Texas' real estate loan records.

Finally, we note that the parties and the *amicus* debate vigorously whether an affirmance of the judgment below would require the FDIC to indemnify Gibraltar out of the FDIC insurance fund under a purported indemnification clause in the purchase and assumption agreement. Because that question is not before us in this appeal we neither consider it nor offer any opinion about its proper resolution.

For the reasons assigned, the summary judgment ordering Gibraltar to create and fund an account is REVERSED and summary judgment is RENDERED herein in favor of Gibraltar. This matter is REMANDED for further proceedings consistent herewith.