**REPUBLIC NATIONAL BANK OF MIAMI, a National Banking Association, Plaintiff–Appellee,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland Corporation, Defendant–Appellant.**

Nos. 87–6034, 88–5185.

United States Court of Appeals, Eleventh Circuit.

Feb. 20, 1990.

---

James S. Crowder, Jr., Kimbrell & Hamann, Miami, Fla., for defendant-appellant.

Stanley A. Beiley, David S. Garbett, Paul, Landy, Beiley & Harper, Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, JOHNSON, Circuit Judge, and BROWN *, Senior Circuit Judge.

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

TJOFLAT, Chief Judge:

In this case, Republic National Bank of Miami (Republic) issued a letter of credit on behalf of the Colombian Coffee Corporation (Colombian) in favor of Luis A. Duque Pena e Hijos, Ltda. (Limitada) [1] to facilitate the supposed purchase and sale of coffee. The transaction having gone awry, Republic sought to recover its loss by filing a timely claim against the coverage afforded by a banker's blanket bond issued by the Fidelity and Deposit Company of Maryland (Fidelity). [2] Fidelity denied Republic's claim, concluding that the bond did not cover the risk taken by Republic in its letter of credit transaction. Republic subsequently brought suit in the Circuit Court of Dade County, Florida; Fidelity thereafter removed the case to the United States District Court for the Southern District of Florida. *See* 28 U.S.C. § 1441(a) (1982). After a bench trial, the district court found in favor of Republic. Fidelity now appeals. We reverse.

## I.

The parties' dispute in this case arises from a commercial transaction involving Republic, Colombian, and Limitada. Because the parties contest the legal significance of Republic's actions during the course of this transaction, we begin our discussion by outlining a paradigmatic letter-of-credit/bill-of-lading transaction, its legal effect, and its underlying rationale.

### A.

In international transactions, a buyer and seller of goods often have never met. In such situations, the seller does not wish to deliver its goods to the buyer before receiving payment; similarly, the buyer does not want to pay the seller before actually receiving the contracted goods. To resolve this problem, such transactions often take the form of a letter-of-credit/bill-of-lading

exchange. *See generally* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 18–1 (2d ed. 1980).

In such a transaction, a buyer (the customer) asks a bank (the issuer) to issue an irrevocable letter of credit made out in favor of the seller (the beneficiary). In the typical case, the bank requires its customer to deposit funds or collateral sufficient to secure the bank's liability to the beneficiary on the letter. *See, e.g., FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 440, 106 S.Ct. 1931, 1939, 90 L.Ed.2d 428 (1986). With a valued customer, however, the bank may accept its customer's note to finance the purchase of the letter of credit.

██ After issuing the letter of credit, the bank delivers the letter to the customer. Upon its delivery, the credit becomes established with regard to the customer, *see* Fla.Stat. § 675.106(1)(a) (1989),[3] and the bank no longer may modify or revoke the letter without the customer's consent, *see id.* § 675.106(2). The customer then delivers the letter of credit to the beneficiary. At this point, the credit becomes established with regard to the beneficiary, *see id.* § 675.106(1)(b), and the bank no longer may modify or revoke the letter without the beneficiary's consent, *see id.* § 675.106(3).

██ Upon receiving the letter of credit, the beneficiary delivers the contracted goods to a carrier, receiving from the carrier a bill of lading. *See generally id.* §§ 677.101–.105, .301–.603. The beneficiary then presents the letter of credit and bill of lading to the issuing bank. Significantly, the bank has no obligation to determine whether the documents presented are in fact genuine; rather, the bank's only duty is to examine the documents on their face to determine that the description of the goods on the face of the bill of lading

---

**1.** The parties and the district court consistently referred to Luis A. Duque Pena e Hijos, Ltda., as "Limitada." We will do likewise in this opinion.

**2.** A banker's blanket bond is "a broad coverage insurance policy that provides protection against such hazards as embezzlement, burgla-

ry, fraud, robbery, and forgery." E. Compton, Principles of Banking 371 (3d ed. 1988).

**3.** We cite to the Florida codification of the Uniform Commercial Code because this case arises under our diversity jurisdiction.

conforms exactly to the description recited on the face of the letter of credit. *See id.* § 675.114(1). If the documents conform, the bank must honor the letter by the third banking day following receipt of the documents. *See id.* §§ 675.112, .114(1).[4]

██ Upon honoring the letter of credit, the bank is immediately entitled to a fee for issuing the letter of credit, generally one-quarter of one percent of the face value of the letter of credit. *See* Verkuil, Bank Solvency and Guaranty Letters of Credit, 25 Stan.L.Rev. 716, 721 n. 29 (1973). More importantly, however, the bank is also immediately entitled to reimbursement from its customer for the amount of money disbursed to the beneficiary, unless the agreement between the bank and the customer otherwise provides. *See* Fla.Stat. § 675.114(3). Until such reimbursement is made, the bank's agreement with its customer invariably allows the bank to hold the bill of lading and other documents presented by the beneficiary as a security interest. *See generally* 7 R. Anderson, Uniform Commercial Code § 5–114:23 (3d ed. 1985). Thus, until the customer pays the bank, he has no access to the goods purchased from the beneficiary.

██ Should the customer default on his obligation, the bank has the right to sell the goods represented by the held documents. *See id.* § 5–114:25; *see also* Fla. Stat. § 679.504 ("[s]ecured party's right to dispose of collateral after default"). The value of this security interest, however, is dubious. The bank may have honored the letter of credit without realizing that the documents presented by the beneficiary were forged or counterfeit. In such a case, of course, the bank's security interest in the documents is worthless. But even absent such fraud, there is always the risk that the goods represented by the documents of title will be nonconforming, damaged, or otherwise devalued. In fact, this risk is quite substantial since the customer is most likely to default on his obligation precisely when the received goods are nonexistent or worth substantially less than the purchase price already tendered to the seller by means of the letter of credit. *See* Verkuil, *supra*, at 721 n. 28.

Upon reimbursing the bank, the customer receives from it the bill of lading and other documents presented by the beneficiary. The customer presents those documents to the carrier, who then turns over the contracted goods to the customer.

Because both the buyer and seller rely not on the other's good faith, but rather on the good faith of the bank and the carrier, the transaction protects the interests of both the buyer and the seller. Through the letter of credit, the seller receives an irrevocable right to payment, not from the buyer, who might become insolvent or refuse to pay, but from the bank. The bank, however, will not pay on the letter of credit until the seller presents the letter of credit along with the bill of lading and certain other documents. These documents establish that the seller has consigned the contracted goods to the carrier and irrevocably bind the carrier to deliver the contracted goods to the buyer upon presentation.

With this model in mind, we turn to the facts of the instant case.[5]

**B.**

Republic entered into the transaction at issue in this case as a result of its relationship with Alberto Duque, a client of the bank. Duque first contacted Republic by a letter dated July 26, 1982, in which he requested a nine-day, unsecured personal loan of $1,800,000. Duque's letter was written on the stationery of Duque Industries, N.V., and was accompanied by a financial statement that showed Duque's net worth to be $113,057,079. The statement

---

**4.** The U.C.C. provides for only one exception to this duty to pay. This exception arises when the customer discovers and informs the bank that the beneficiary has engaged in forgery or fraud. Even in such a situation, however, the bank has the right to honor the letter of credit if it chooses to do so, *see* Fla.Stat. § 675.114(2)(b), and in fact the bank must honor the letter if presented by another bank which has status as a holder in due course, *see id.* § 675.114(2)(a).

**5.** The parties do not dispute the facts; rather, they dispute the facts' legal significance.

disclosed that Duque had interests in Colombian (a New York-based coffee broker) and the Duque Group, Colombia. Republic's own investigation revealed that the Duque Group was owned solely by Duque, his father and his brothers and that the company controlled the second largest exporter of coffee in Colombia, Limitada. Republic also discovered that Duque owned 87.4% of the City National Bank Corporation, the parent corporation of the City National Bank of Miami.

Three days later, on July 29, Republic's loan committee approved an unsecured, seven-day loan to Duque in the amount of $500,000 for the purchase of coffee. The loan closed that same day, and Duque used its proceeds to open a personal checking account at Republic. Duque also executed and delivered to Republic on July 29 a power of attorney authorizing Camilo Bautista to act in connection with Duque's account in all respects as Duque himself. Republic's records listed the account as belonging to "Duque, Alberto, with Power of Attorney to Camilo Bautista." This first loan was repaid on August 9, 1982.

On August 27, 1982, Duque again wrote to Republic on the letterhead of Duque Industries, requesting a second personal unsecured loan to facilitate the purchase of coffee, this time in the amount of $750,000. On September 2, Republic's loan committee approved a thirty-day, $500,000 unsecured personal loan to Duque, and the bank made the loan. The committee's approval memorandum noted that Duque was principal stockholder in City National Bank Corporation and that Duque also owned interests in the General Coffee Corporation (a coffee roaster and wholesaler), Colombian, and other companies.

On October 4, 1982, Bautista, writing on the letterhead of Duque Industries, requested a sixty-day extension of Duque's $500,000 loan. Bautista's letter was accompanied by a check for $6,575.35 drawn on the account of the General Coffee Corporation in payment of the accrued interest on Duque's loan. On October 7, Republic's loan committee approved the extension. On December 6, Republic received a check from the General Coffee Corporation in the amount of $513,369.85 in payment of Duque's second personal loan, plus the interest for the extended period.

On December 28, Bautista, again writing on the letterhead of Duque Industries, requested a third $500,000 unsecured personal loan on behalf of Duque. Republic's loan committee approved the loan on December 30, repayment in ninety days, and the loan closed that same day. The loan committee's approval memorandum again noted Duque's interests in the City National Bank Corporation and Colombian.

On February 3, 1983, while Duque's third personal loan was still outstanding, Bautista requested a letter of credit in the amount of $1,239,000 to finance the exportation of 6000 bags of Colombian coffee. The letter of credit was to be issued by Republic on behalf of Colombian; the beneficiary of the letter of credit was to be Limitada. A holder could draw on the letter upon presenting a set of original invoices, the original "Received on Board" bills of lading, and a certificate of insurance. Bautista further proposed that "the terms would be approximately 45 days; however, how we would structure this is for you to hold the original documents until the coffees arrive on port at which time we would make payment so that you can release the documents to us."

On that same day, Republic's loan committee approved the issuance of an irrevocable letter of credit along the terms suggested by Bautista. The memorandum accompanying the committee's decision related, in addition to the terms and conditions of the letter's issuance, the following information concerning Colombian. Colombian's address was listed as "3400 South Moorings Way, Coconut Grove, Florida 33133"—Duque's home address. The principals of Colombian were listed as Gaston Pereira, President, and Anthony Infante, Director. Financial highlights of Colombian disclosed a net worth of $4,449,300 in 1981 and $4,474,500 in 1982. In addition, the memorandum noted that Colombian's "account relationship" to Republic was through Alberto Duque, who agreed to

guarantee Colombian's obligation to Republic. The memorandum concluded with the following remarks:

> Our Institution will hold all original documents presented through the [letter of credit] drawing until the coffees arrive on port at which time payment will be made on the refinancing.... Approval of this request is recommended based on Alberto Duque's strong moral and financial position.

Republic subsequently received from Colombian an "Application and Agreement for Commercial Letter of Credit" signed by "Fernando Bautista, Vice President." Republic accepted this application although it had no corporate resolution or any other record or information indicating that Bautista was an officer of Colombian. Relying on Bautista's assertion of authority, Republic issued Irrevocable Letter of Credit No. I-11366 in the amount of $1,239,000 in favor of Limitada on February 14, 1983. At the time Republic issued this letter, the bank's $1,239,000 obligation was secured only by Colombian's promise to repay the bank in forty-five days and Duque's guarantee of that obligation. Colombian's obligation to the bank was evidenced only by the correspondence between Republic and Bautista; the bank had no note or its equivalent from Colombian evidencing its obligation.

On February 15, Bautista sought to draw on the letter of credit, signing as "Vice-President II" of Limitada. The letter was written on the stationery of Duque Industries and was accompanied by the required original invoices and bills of lading.[6] Republic, however, refused to pay on the letter of credit because Republic had no verification that Bautista had authority to act on behalf of Limitada. After receiving Republic's refusal, Bautista began to confer with bank officers in an attempt to arrive at a mutually acceptable method by which he might draw on the letter of credit.

While these negotiations were proceeding, Republic was considering whether to dishonor a $1,000,000 check drawn on Duque's account at Republic and payable to the General Coffee Corporation. This check had been deposited at a Miami bank and was presented for payment at Republic on February 16, 1983. At that time, Duque's account at Republic had a balance of $12,149.89; thus, honoring the check would result in Duque's account being overdrawn by $987,850.11. Under the Uniform Commercial Code, Republic was required to pay or dishonor Duque's check by midnight on February 17. See Fla.Stat. §§ 673.508(2), 674.104(1)(h).

With the midnight deadline in mind, Republic and Bautista eventually agreed to a method by which Bautista could draw on the letter of credit. Specifically, Republic agreed to issue a cashier's check in favor of Limitada drawn on the letter of credit; the cashier's check, however, would bear a restrictive endorsement permitting the check only to be deposited with Republic. Republic further agreed that Bautista could negotiate the check on behalf of Limitada if he could get a bank with which Limitada had an account to guarantee his endorsement.

In accordance with this arrangement, Bautista presented on February 17 three original invoices and bills of lading to Republic pursuant to the terms of the letter of credit. The bills of lading identified 6000 sacks of coffee received on board from Limitada on February 2. The accompanying invoices were dated February 4 and noted that the coffee was to depart from Colombia on February 9. The invoices further stated that payment terms were "CASH AGAINST ORIGINAL DOCUMENTS ... AS PER L/C I-11366 of REPUBLIC NATL. BANK OR MIAMI DAT-

---

6. Although Camilo Bautista's initial request for the letter of credit, the loan committee's memorandum, and the letter of credit application all anticipated that Colombian would also provide a certificate of insurance, the actual letter of credit omitted this requirement, stating instead that "[w]e understand the insurance will be cov- ered by the Buyers." An employee in Republic's credit department evidently made this alteration without consulting his superiors, having noticed that the coffee was to be shipped "F.O.B." As a result, no insurance certificate was ever required by Republic or provided by any of the participants in the transaction.

ED 2/14/83." In examining these documents, Republic made no attempt to inquire why Limitada would have delivered its coffee to a carrier twelve days before Republic had issued a letter of credit in favor of Limitada. Nor did Republic inquire as to why Limitada would allow its goods to depart from Colombia on February 9, five days before the issuance of Republic's letter of credit. Nor did Republic consider how Limitada could have known when it issued the three invoices on February 4 that Republic would issue its letter of credit on February 14 or how Limitada could have known on February 4 what number Republic's letter of credit would bear.

Either not noticing or ignoring these anomalies in the proffered invoices and bills of lading, Republic issued a cashier's check in the amount of $1,239,000 to the order of Limitada. The check was issued on February 17, even though Republic was not required to make payment until three days after demand. *See* Fla.Stat. § 675.112. Later that day, Bautista presented the check for deposit in Duque's account at Republic. The check contained the following endorsements:

[Rubber Stamped]: FOR DEPOSIT ONLY WITH REPUBLIC NATIONAL BANK OF MIAMI

[By Typewriter]: FOR DEPOSIT ONLY TO ACCOUNT OF ALBERTO DUQUE

ACCT. # 220–089–4 LUIS A. DUQUE PENA e HIJOS, LTDA.

[i.e., Limitada]

sd/Camilo Bautista

CAMILO BAUTISTA

Vice President II

ENDORSEMENT GUARANTEED

THE CITY NATIONAL BANK OF MIAMI

CORAL GABLES BRANCH

by [Signature illegible]

Vice–Pres.

In accepting the check, Republic made no attempt to verify City National's guarantee, to inquire whether Limitada maintained an account with City National, or to determine whether City National had any corporate resolution of Limitada in its files. Republic admits that it immediately used the funds deposited in Duque's account to cover Duque's $1,000,000 check, thus meeting its midnight deadline.

On that same day, Republic wrote to Colombian, advising it that Limitada had drawn on the letter of credit and that Colombian owed a payment fee of $3,097.50 for this service, which Republic had charged against Duque's account. Republic's letter specifically stated that the bank "assume[d] no responsibility for the genuineness of the documents or for the quantity or quality of the merchandise represented hereby or for its arrival." Republic eventually received a note for $1,239,000 from Colombian that reflected Colombian's right to forty-five day refinancing commencing on February 17. When this note came due on April 4, Colombian requested and received a fifteen-day extension. Colombian thereafter delivered a renewal note to Republic for $1,239,000, due on April 19. Republic admits it does not know who signed these notes on behalf of Colombian.

On April 19, 1983, Colombian defaulted on its $1,239,000 note. At the same time, the financial community began to discover that Duque had perpetrated a massive fraud in an attempt to keep his family's financial empire afloat. This fraud involved falsely collateralized loans, prohibited insider bank transactions, and corporate legerdemain with the assets of Colombian and General Coffee Corporation. *See generally United States v. Castro*, 829 F.2d 1038, 1039–44 (11th Cir.1987) (giving a comprehensive description of Duque's fraud), *modified in part*, 837 F.2d 441 (11th Cir. 1988). As a result of these maneuvers, Duque and Bautista were convicted of various offenses. *See id.* at 1044–50. In addition, Duque and several of his companies, including Colombian, filed for bankruptcy in the Southern District of Florida. Upon learning of Duque's fraud, Republic conducted an investigation to locate the coffee described in the bills of lading. This investigation revealed that the bills of lading were forged and that the coffee represent-

ed by the bills of lading in fact did not exist.

With these facts in mind, we turn to the parties' dispute over the coverage provided by Fidelity's banker's blanket bond.

## II.

■ Clause (E) of Fidelity's bond insures Republic against, among other things:

(E) *Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,*

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a) Security

(b) *Document of Title* [including a bill of lading]

(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

which

(i) *bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery,* or

(ii) is altered, or

(iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (g) above;

(3) acquired, sold, or delivered, or given value, extended credit or assumed liability on the faith of, or otherwise acted

upon, any item listed in (a) through (d) above which is a Counterfeit.

(Emphasis added.) The bond further provides that:

Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

Republic argues that it relied on the forged bills of lading in honoring the letter of credit; Republic therefore contends that its loss is covered by the terms of Fidelity's banker's blanket bond. We disagree.[7]

The blanket bond specifically states that actual physical possession of a forged document is a condition precedent to the insured's reliance upon such a document. The record in this case establishes that Republic entered into a binding contract to finance Colombian's letter of credit on February 3. On February 16, Republic issued its letter of credit. On that same day, Republic's irrevocable obligation to honor the letter became established. Republic did not, however, receive physical possession of the forged bills of lading until February 17, when Limitada first presented them to the bank. Thus, by the time Republic received the forged bills, it already was irrevocably committed to the course of action that resulted in its loss. Republic, therefore, did not have the forged documents in its physical possession at the time it purportedly acted in reliance upon them. In fact, since a beneficiary will *always* present the bills of lading after the bank already has irrevocably committed itself to extend credit to its customer and to honor the letter of credit presented by the beneficiary, the condition precedent contained in the banker's blanket bond will *always* preclude a bank from recovering for a loss arising out of its misplaced reliance on documents of title presented by

---

**7.** We note that Republic evidently was unable to recover any of its loss from Colombian. On appeal, the parties dispute the exact amount of Republic's loss; our disposition makes this issue

moot. For purposes of discussion *only,* we assume that the loss was the full value of the letter of credit—$1,239,000.

the beneficiary of that letter of credit transaction.[8]

 Republic's claim, however, is meritless for another, more fundamental reason. In order to recover under the Fidelity bond, Republic must establish that it *relied* on the forged bills of lading. We believe that accepted standards of commercial reasonableness preclude such a determination as a matter of law.

When a bank issues a letter of credit, it knows that the beneficiary will have to present certain documents before the bank is bound to honor the letter. The bank, however, has no guarantee that these documents will be genuine, nor is it entitled to one. Thus, no bank can reasonably rely on documents presented by a beneficiary to secure the risk that the bank takes in financing a letter of credit on behalf of a customer: such "reliance" is no more than a bet on the roll of the dice.[9] We therefore conclude that when Republic agreed to finance Colombian's request for a letter of credit, the bank did so in reliance on Colombian's credit and Duque's guarantee of that credit.

In so holding, we note that this court has long recognized that a banker's blanket bond " 'is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal.' " *Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co.*, 533 F.2d 290, 299 (5th Cir.) (quoting *Allen State Bank v. Traveler's Indem. Co.*, 270 So.2d 270, 273 (La.Ct. App.1972)), *cert. denied sub nom. Louisiana Bank & Trust Co. v. Employers Liability Assurance Corp.*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *see also East Gadsden Bank v. United States Fi-*

**8.** The dissent attaches more significance to Republic's act of issuing the cashier's check to Limitada than that act deserves. Under Fla. Stat. § 673.303, giving "value" is defined as, among other things, making an "irrevocable commitment to a third person." In the comment following that section, the drafters use a letter of credit as an example of such an irrevocable commitment to a third party. *Id.* Uniform Commercial Code comment 6. Therefore, Republic gave value, as that term is used in the U.C.C., when it issued the letter of credit to Colombian; thereafter it simply held the $1,239,000 in trust for the benefit of Limitada with the absolute and irrevocable obligation to tender the funds to Limitada when presented with a bill of lading. Thus, to accept the dissent's argument that Republic gave value when it issued the cashier's check to Limitada, we must hold that Republic gave value twice under the same letter of credit. This Republic could not do.

**9.** Of course, any extension of credit entails some degree of risk. A bank's success depends on its being able to quantify the extent of its risk in a particular transaction. The bank does this by thoroughly investigating the financial stability of the borrower. The results of that investigation establish whether the bank can rely solely on the credit of its customer (i.e., an unsecured loan), or whether the bank must impose certain conditions to safeguard its interests (i.e., a mortgage, a guarantee, etc.). In a letter-of-credit/bill-of-lading transaction, however, the bank has no means by which to assess the risk it would be taking if it were to rely on the bills of lading presented by the beneficiary to secure its customer's obligation. Since the underlying rationale behind the letter-of-credit/bill-of-lading transaction form is that neither the buyer nor the seller trusts the credit of the other, the bank has no reason to rely upon the good faith of the beneficiary. Nor can the bank rely upon the goods represented by the bills of lading. The bank will first see the bills when the beneficiary attempts to draw on the letter of credit, after which the bank has only three days in which either to honor or dishonor the letter. *See* Fla.Stat. § 675.112. Since the goods represented by the bills of lading normally are in transit to the buyer—and thus are often located somewhere on the high seas—the bank ordinarily will be unable to inspect the condition and value of the goods. Such investigation, of course, would be expensive, and the information gained thereby largely pointless anyway, because whether or not the beneficiary has fulfilled his obligation to the buyer and whether or not the goods are sufficient security, the bank has the duty, absent fraud, to pay on its letter of credit if the documents conform *on their face. See id.* § 675.114. Thus, the only person upon whom the bank can rely in issuing its letter of credit—the only person upon whom the bank is *supposed* to rely in issuing its letter of credit—is its customer.

The facts of this case drive home this point. Had Republic truly relied on the bills of lading presented by Limitada as collateral, any number of red lights should have gone off in connection with this transaction. Despite these warning lights, however, Republic remained unconcerned. Why? Because Republic's risk was *not* dependent upon the outcome of the transaction between Colombian and Limitada. Republic's risk was wholly dependent upon the credit of its customer, Colombian, and the guarantor of that credit, Duque.

*delity & Guar. Co.*, 415 F.2d 357, 359 (5th Cir.1969).[10] Were we to hold that Republic could recover on a banker's blanket bond in the instant transaction, we would in effect transform the blanket bond into such an insurance policy: our decision would allow banks to rely on documents presented by a beneficiary to a letter of credit transaction not because they are worthy of such reliance, *but rather because the reliability of such documents is insured.* At the least, such a holding would encourage sloppy banking practices such as those Republic employed in this case, for if a bank can rely on the documents of title presented by the beneficiary of a letter of credit, why should it bother to investigate thoroughly the credit worthiness of its customer? At the worst, of course, such a holding would promote outright fraud against the insurer. The result? Insurance companies would either raise their rates, rewrite their policies to exclude coverage under clause (E), or rescind clause (E) coverage altogether. Thus, we believe that no one ultimately would gain from a holding allowing coverage in this case.

### III.

We conclude that the district court erred in allowing Republic to recover its loss from Fidelity under the banker's blanket bond. The decision of the district court is accordingly

REVERSED.

JOHN R. BROWN, Senior Circuit Judge, dissenting:

The result of this case is startling, not only in terms of its practical consequences, but equally in terms of the legal pronouncements it makes which, until the Supreme Court of Florida pronounces a decision, are binding on Eleventh Circuit federal litigants and is theoretically persuasive on non-Eleventh circuit litigants.

After holding in effect that the only significant time Republic extended credit was at the moment it issued the irrevocable letter of credit on February 14, 1983, the court, on the basis of the physical possession condition of the Banker's Blanket Bond [1] (which concededly it did not have at the moment the letter of credit was issued) went on to deliver this surprising statement for all time, for all persons, and all hopeful assureds:

> In fact, since a beneficiary will *always* present the bills of lading after the bank already has irrevocably committed itself to extend credit to its customer and to honor the letter of credit presented by the beneficiary, the condition precedent contained in the banker's blanket bond will *always* preclude a bank from recovering for a loss arising out of its misplaced reliance on the documents of title presented by the beneficiary of that letter of credit transaction.

(Emphasis by the court.)

Since the court's declaration would eliminate coverage for, say, a forged corporate guarantee, this is almost saying to a bank paying substantial premiums for supposed coverage, "thanks so much, but you have bought a pig in a poke." *See* (E)(1)(f)(i).

Perhaps reflecting some doubt about the universal correctness of this sweeping declaration, the court goes on to hold that Republic's claim is meritless "for another, more fundamental reason." *See ante* at page 1263. It then proceeds to develop that reason: failure to prove reliance "on the *forged* bills of lading." (Emphasis added.) This leads the court to announce the proposition—which must be dubious in a world of commerce dependent on the reasonable, if not always legally enforceable, expectation of good faith performance—that in a letter of credit situation the issuing bank "has no guarantee that these [the

---

**10.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**1.** The bond provides that:

Actual, physical possession of the items listed in ¶¶ (a) through (g) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insureds having relied on the faith of, or otherwise acted upon, such items.

documented bills of lading] will be genuine, nor is it entitled to one." *Ante* at page 1263. Engaging then perhaps in a sort of Casino (not Lexis) search, the court expresses the legal view that such reliance "is no more than a bet on the role of the dice." *See ante* at page 1263 & n. 9.

Emphasizing the temporal scope of the reliance, the court then concludes that with no possible reliance on bills of lading incapable then of being in its possession: "When Republic agreed to finance Colombian's request for a letter of credit, the bank did so in reliance on Colombian's credit and Duque's guarantee of that credit."

Whatever soundness these there might be in these statements, they dramatically highlight that the court is missing the whole point of this insurance controversy: "The tender of, and reliance on, forged bills of lading at the time the demand is made for performance (payment) by the bank under its letter of credit promise to pay."

The court's emphasis, on the contrary, is on the moment the agreement to issue the letter of credit is made. It is at that time, so the court holds, that reliance by the bank must be solely on the creditworthiness of the customer (requester) and not on any expectation of bills of lading later on. But this ignores what took place, not at the time of the *issuance* of the letter of credit, but at the time of demand for performance of the bank's promise to pay.

There is no dispute about the facts. Indeed, I embrace fully this court's findings which may be pieced together in a single composite quotation:

> On February 15, Bautista sought to draw on the letter of credit.... The letter was written on the stationery of Duque Industries and was accompanied by the required original invoices and bills of lading.... In accordance with this arrangement, Bautista presented on February 17 three original invoices and bills of lading to Republic pursuant to the terms of the letter of credit. The bills of lading identified 6,000 sacks of coffee received

on board from Limitada on February 2. Either not noticing or ignoring these anomalies [invoice dated February 4, shipment to be made on February 9, invoice references to a letter of credit to be issued on 2/14/83] in the proffered invoices and bills of lading, Republic issued a cashier's check in the amount of $1,239,000 to the order of Limitada.... On that same day, Republic wrote to Colombian advising it that Limitada had drawn on the letter of credit and that Colombian owed a payment fee of $3,097.50 for this service.

It is uncontradicted that at the time the bank issued its certified check in compliance with the letter of credit, it was in possession of the documented bills of lading and invoices. Whatever may have been the situation at the time the letter of credit was *issued*, it is undisputed that the bank received and acted upon the bills of lading as called for in the letter of credit. Indeed, despite disclaiming, in its letter requesting payment of its service fee, responsibility for the genuineness of the bills of lading,[2] Republic, after Duque's fraud was publicly disclosed, continued its reliance on the bills of lading. Republic, so the court states, "conducted an investigation to locate the coffee described in the bills of lading. This investigation revealed that the bills of lading were forged and that the coffee represented by the bills of lading in fact did not exist." *See ante* at page 1261.

This brought the whole thing explicitly within the coverage of (E)(1)(b)(i). The bank, pursuant to (E)(1), gave "value [$1,239,000] ... on the faith of, or ... acted upon [an] original (b) Document of Title [bills of lading] which were (i) a Forgery.

The District Judge was right. On the literal words of the Banker's Blanket Bond and the facts found by him and articulated by us, it was a classic case of coverage for the consequences of acting upon forged

---

**2.** Republic's letter to Colombian requesting payment of $3,097.50 also stated that the bank "assumed no responsibility for the genuineness of the documents or for the quantity or quality of the merchandise represented hereby or for its arrival." *See ante* at page 1261.

bills of lading which were then in the bank's possession.

I must therefore respectfully dissent.