**M.J.F.M. KOOLS, d/b/a Kools De Visser, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 94 Civ. 2107 (MBM).**

United States District Court, S.D. New York.

Jan. 5, 1995.

Gregory E. Sohns, Colamarino & Sohns, New York City, for plaintiff.

Robert E. Bartkus, Claudio B. Bergamasco, Pinto, Rodgers & Kopf, Morristown, NJ, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, M.J.F.M. Kools, a citizen of the Netherlands, brings this diversity action against Citibank, N.A. for alleged fraud and breach of contract arising out of Citibank's payment on a letter of credit to Jade–USA, Inc. Citibank has moved to dismiss for lack of standing, failure to plead fraud with particularity, pursuant to Fed.R.Civ.P. 9(b), and failure to state a claim, pursuant to Fed. R.Civ.P. 12(b)(6). For the reasons set forth below, defendant's motion is granted because Kools lacks standing to sue.

### I.

The facts and allegations, construed in the manner most favorable to plaintiff, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), are as follows. Kools is the sole proprietor of Kools de Visser, a Dutch entity engaged in the wholesale and retail clothing industry. (Complt. ¶ 1) On October 28, 1992, Kools, through his agent, Rudy Oei, applied for a commercial letter of credit with defendant Citibank in the amount of $1,004,400 to purchase "LEVI JEANS 501–0191, New, Originals, Made in USA" from Jade–USA, Inc. (Complt. ¶ 7, Ex. A) In consideration for the letter of credit, Oei deposited $1,080,000 with Citibank. (Complt. ¶ 8; Ex. I) The agreement was solely between Oei, "the Applicant," and Citibank, the issuer. (Complt. Ex. A) The terms of the letter of credit were amended on November 2, 1992 and November 4, 1992. (Complt. Ex. B)

Under the amended agreement, Jade–USA, as beneficiary of the letter of credit, would obtain payment from Citibank when it presented the following documentation: (1) a sight draft bearing the identifying reference specified on the letter of credit; (2) an original and four copies of Jade–USA's commercial invoice for merchandise described as "LEVI JEANS 501–0191, NEW, ORIGINALS, MADE IN USA LABELS"; (3) an

insurance policy and/or certificate; (4) all originals of a "MARINE/ON BOARD OCEAN BILL OF LADING OR CONTAINER BILL OF LADING OR BILL OF LADING BEARING CONTAINER ENDORSEMENT" issued to Kools de Visser marked "NOTIFY RUDY T. OEI" and "FREIGHT PAID"; (5) a packing list; (6) a certificate of compliance of quality and inspection by Lloyds of London; and (7) a statement that the merchandise had been shipped from Seattle, Washington and sold "CIF the Netherlands." (Complt. ¶¶ 10–11; Ex. B)

On November 19, 1992, Jade–USA made its first effort to obtain payment under the letter of credit. The documents it presented, however, did not conform to the agreement. Instead of presenting an "on board" marine bill of lading, Jade–USA included a bill of lading issued by Eagle Freight Services, showing a shipment by truck from Seattle, Washington to Rotterdam, the Netherlands, of "900 boxes containing garments." (Complt. ¶ 13; Ex. C) This discrepancy, along with others, was noted by Luis Castellanos, Citibank's document examiner. Castellanos apparently called Jade–USA's president, Diann Hart, to advise her of the discrepancies; Hart told him to "hold on" to the documents and that new ones would be issued. (Complt. ¶ 14; Ex. D)

On November 25, 1992, Jade–USA sent a new set of non-conforming documents to Citibank. Castellanos noted several discrepancies, including a faulty marine bill of lading, which, when read together with the earlier truck bill of lading, suggested that "the same goods were simultaneously being transported by truck and by ship from Seattle to Rotterdam." (Complt. ¶ 17; Exs. E–F) Five days later, Jade–USA made its third effort to present the proper documents, and again sent non-conforming ones. The discrepancy report appears to state that the bill of lading and insurance forms failed to mention "jeans," and that an inspection certificate was missing. (Complt. Ex. H) Despite these identified irregularities, Citibank approved the documents and paid Jade–USA. Defendant argues that the discrepancy report "evidences that … Mr. Oei approved

payment." (Def.Mem. at 9) The document, however, does not support defendant's assertion. Although the report does indicate clearly that the payment was approved on December 2, the explanation for the approval reads "OK to pay [illegible] Carlos 12/2." The telephone number listed below the notation has a Westchester, New York area code (914); Oei's address on the agreement is in Connecticut, which has a different area code (203). These facts weaken considerably defendant's claim that Oei waived any discrepancies and approved payment to Jade–USA.

On December 2, Citibank sent an "advice of payment" to Oei stating that payment had been made to Jade–USA. Attached to the letter were documents delivered by Jade–USA, which Citibank believed "to be in due form and regular in every respect." (Complt. Ex. I) Citibank assumed "no responsibility for the genuineness of the documents or for the quality or quantity of the merchandise represented thereby." (*Id.*) Each of the documents fails on its face to satisfy the terms of the letter of credit. The draft is not marked with the required identifying information; only one of the invoices contains the word "jeans"; the three alleged originals of the replacement bill of lading are inconsistent with one another, and all omit the word "jeans"; the insurance document is neither a policy nor a certificate, fails to meet the standards set under Article 37b of the Uniform Customs and Practice for Documentary Credits (1983) ("UCP"), and fails also to include the word "jeans"; the inspection report is from an "agent" of Lloyds of London, apparently covers only half the shipment, identifies the wrong carrier, and incorrectly describes the merchandise; finally, the packing list misdates the shipment, and refers inconsistently to the quantity of the merchandise. (Complt. ¶¶ 22–28; Ex. I)

Kools alleges that Citibank altered some of the documents after receiving them from Jade–USA. For example, the word "jeans" appears to have been added to both the packing list, and the original invoice. (Complt. ¶ 30) Kools claims that Jade–USA never shipped any merchandise to Kools, that the replacement bill of lading, insurance document, inspection report, truck bill of lad-

ing and marine bill of lading were all forgeries, and that the draft, invoice and packing list "all fraudulently purported to relate to a shipment of merchandise which had not occurred." (Complt. ¶ 32)

Kools's first claim alleges that Citibank paid Jade–USA "knowing, or recklessly disregarding the fact" that the presented documents were "forgeries, fraudulent and nonconforming." (Complt. ¶ 33) Kools alleges also that Citibank fraudulently hid the discrepancies, and aided and abetted Jade–USA in its fraudulent scheme. Because of Citibank's alleged fraudulent concealment and material misrepresentations, Kools asserts it did not learn of Citibank's actions until it obtained third-party discovery from the bank in litigation commenced by Kools against Jade–USA and its president in a Florida state court.

Kools's second claim alleges that Citibank breached its contract with Kools "to examine all documents ... with reasonable care to ascertain that such documents appeared on their face" to comply with the terms of the letter of credit. (Complt. ¶ 44) Kools alleges damages of $1,262,338.

### III.

■ The threshold question is whether Kools, as Oei's undisclosed principal, has standing to maintain this action against Citibank. Although it is undisputed that under New York law a "contract not under seal made in the name of an agent as ostensible principal, may be sued on by the real principal at the latter's election," *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 509 F.Supp. 1067, 1069 (S.D.N.Y.) (quoting *Kelly Asphalt Block Co. v. The Barber Asphalt Paving Co.*, 211 N.Y. 68, 70, 105 N.E. 88 (1914)), *rev'd on other grounds*, 663 F.2d 4 (2d Cir.1981), the law is far from settled on whether this tenet of general agency law applies to letters of credit, which are a singular form of contract. *Mutual Export Corp. v. Westpac Banking Corp.*, 983 F.2d 420, 423 (2d Cir.1993) ("Letters of credit are unique commercial instruments" and "[t]raditional contract rules apply 'only to the extent that contract principles do not interfere with the unique nature of credits.'")

(quoting John F. Dolan, The Law of Letters of Credit § 2.02 at 2–5 (2d ed. 1990)); *In re Coral Petroleum, Inc.*, 878 F.2d 830, 832 (5th Cir.1989) ("a letter of credit is not an ordinary contract but instead a unique device developed to meet the specific needs of the marketplace") (applying New York law); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1537 (S.D.N.Y.1985) (describing the letter of credit as "a relationship with no perfect analogies but nevertheless a well defined set of rights and obligations") (quotation omitted), *aff'd*, 808 F.2d 209 (2d Cir.1986); J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 18–2, at 711 (2d ed. 1980) ("it was one of the prime purposes of the drafters of Article Five [pertaining to letters of credit] to set an independent theoretical framework for this device, a framework independent of contract, of guaranty, of third party beneficiary law, of the law of assignment, and of negotiable instruments"); *but see Worldwide Sugar Co. v. Royal Bank of Canada*, 609 F.Supp. 19, 23 (S.D.N.Y.) ("Letters of credit are contracts, and as such are governed by general principles of contract law"), *aff'd*, 751 F.2d 373 (2d Cir.1984).

■ Letters of credit evolved to alleviate some of the risks in commercial transactions in which the buyer and seller have not met, and in which the buyer does not want to deliver goods to the seller before receiving payment, and the buyer does not want to pay the seller before receiving the goods. To resolve this problem, the buyer (the applicant) arranges with a bank (the issuing bank) to issue a letter of credit in favor of the seller (the beneficiary) for the price of the goods. Negotiations between the applicant and the bank establish the terms of the credit, and the documents the beneficiary must present to receive payment. The applicant promises to reimburse the issuer when it honors the beneficiary's documents. The issuing bank frequently requires the applicant to deposit funds or other collateral sufficient to secure the bank's liability to the beneficiary. *Republic Nat'l Bank of Miami v. Fidelity and Deposit Co. of Maryland*, 894 F.2d 1255, 1257 (11th Cir.), *cert. denied*, 498 U.S. 926, 111 S.Ct. 308, 112 L.Ed.2d 261 (1990). The

bank's promise to pay the beneficiary under the letter of credit "is completely independent of the underlying sales contract between the buyer and the seller." *Full–Bright Indus. Co., Ltd. v. Lerner Stores, Inc.,* 818 F.Supp. 619, 621 (S.D.N.Y.1993).

▮ The letter of credit issued by Citibank incorporates the terms of the UCP, an internationally accepted codification of banking practice and custom whose provisions, when incorporated in a contract, displace Article 5 of the Uniform Commercial Code ("UCC"). *Ross Bicycles, Inc. v. Citibank, N.A.,* 161 Misc.2d 351, 353, 613 N.Y.S.2d 538, 540 (New York County 1994) Only if the UCP is silent or ambiguous may a provision of the UCC be consulted, and then only if it is consistent with the UCP. *Optopics Lab. Corp. v. Savannah Bank of Nigeria, Ltd.,* 816 F.Supp. 898, 909 (S.D.N.Y.1993). Under the UCP, the letter of credit relationship is a tripartite arrangement among the issuing bank, the applicant for credit [1], and the beneficiary, UCP Article 2(i), with one exception: the issuing bank, acting at the request of the applicant, may authorize another bank (the advising bank) to "effect such payment, or to pay, accept or negotiate such bills of exchange against stipulated documents." UCP Article 2(ii). The issuing bank is in "no way concerned with or bound" by any contract outside its agreement with the applicant "even if any reference whatsoever to such contract is included in the credit." UCP Article 3. Both the UCP and the UCC are silent as to the rights of undisclosed principals. The UCP emphasizes, however, that the applicant alone is the bank's customer, and therefore implies that only the applicant, and not an undisclosed principal, may exercise rights delineated in other provisions.

Plaintiff argues that *Taub v. Colonial Coated Textile Corp.,* 54 A.D.2d 660, 661, 387 N.Y.S.2d 869, 870 (1st Dep't 1976) is dispositive on the issue of standing. *Taub* held that "an undisclosed principal on whose behalf the letter of credit was opened ... may prose-

cute the action in his own name" because it is the "real party in interest." *Id.* The sole cited authority for this assertion was *Kelly Asphalt Block Co.,* 211 N.Y. at 70, 105 N.E. 88, an opinion that did not involve a letter of credit. The *Taub* opinion does not mention the UCC or the UCP, the unique nature of letters of credit, or any policy reasons for granting standing to plaintiff in that case. The brief submitted by defendant in *Taub* failed also to raise these issues, and neglected to cite precedent in this Circuit and elsewhere that would have denied standing to plaintiff in that case. (Bartkus Aff. Ex. D) After considering these Second Circuit and other opinions, the strict definition of customer in the UCP, and policy reasons for limiting actions to the applicant alone, I respectfully disagree with the conclusion reached in *Taub* and decline to follow that case.

In *Kunglig Jarnvagsstyrelsen v. National City Bank of New York,* 20 F.2d 307, 308–09 (2d Cir.), *cert. denied,* 275 U.S. 497, 48 S.Ct. 121, 72 L.Ed. 392 (1927), the Second Circuit first considered the rights of a plaintiff to bring suit against a bank with which it lacked an express contract. The Court held that because plaintiff's relationship was with a correspondent bank, and not with the issuing bank, it could not "recover upon any contract made by the correspondent bank." *Id.* Kools argues that *Kunglig* is distinguishable because in that case plaintiff's apparent agent was a bank, while Kools' alleged agent was a person. (Pl. Mem. at 12) This is a distinction without a difference, however, because there is no principled reason to differentiate between an institution and a person when both are acting as agents. The *Kunglig* Court was concerned with privity, and not with whether the entities involved were natural persons or legal creations. Under the holding of *Kunglig* and its progeny, absent a direct link to the issuing bank, Kools may not stand in the shoes of its alleged agent and bring suit against Citibank. *See*

---

1. The UCC, which does not govern this transaction, adopts a slightly different description of the issuing bank's customer. It provides that a customer is a "buyer or other person who causes an issuer to issue a credit." N.Y.U.C.C. § 5–103(g) (McKinney 1991). This definition, unlike the UCP's, suggests that the customer can be someone other than the person who actually enters into the agreement with the bank. The UCP therefore is more restrictive in defining who may be considered a party to a letter-of-credit transaction.

*Bank of Cochin,* 612 F.Supp. at 1538 ("the ultimate customer . . . may be barred from a direct action against the confirming bank because of the absence of privity"); *Dulien Steel Prods., Inc. v. Bankers Trust Co.,* 189 F.Supp. 922, 929 (S.D.N.Y.1960) (lack of privity argument "may have some merit"), *aff'd,* 298 F.2d 836 (2d Cir.1962).

Courts in other circuits have emphasized that in letter-of-credit transactions, banks have no liability to persons with whom they have had no direct contact. In *Confeccoes Texteis de Vouzela v. Riggs Nat'l Bank,* 994 F.2d 851, 853–854 (D.C.Cir.1993), the Court disallowed plaintiffs' claim that a confirming bank owed them a duty. The Court emphasized that under the UCC, the *"only* duty owed by a confirming bank is to *its* customer, the issuing bank." *Id.* at 853 (emphasis in original). In *Sound of Market Street, Inc. v. Continental Bank Int'l,* 819 F.2d 384, 394 (3rd Cir.1987), the Third Circuit interpreted New York law to hold that an advising bank owed no statutory or tort duty to a mere potential beneficiary. The Tenth Circuit held in *Arbest Constr. Co. v. First Nat'l Bank & Trust Co. of Oklahoma City,* 777 F.2d 581, 584 (10th Cir.1985), that nonassignee third parties to a letter of credit had no rights against the issuing bank. The Court found that this limiting rule was "grounded in policy." *Id.* It is to this policy that I now turn.

■ A fundamental principle of letter-of-credit law provides that the issuer remains immune from all "responsibilities to police the underlying transaction." *Id.* Holding an issuing bank liable to third parties would not only defeat this principle of separation, but also would inhibit the willingness of a bank to extend credit. The issuing bank concerns itself only with the applicant's financial reliability, and it is on this basis alone that the bank becomes involved in a transaction. For a bank to be liable even potentially to undisclosed principals would force it to investigate the background of other entities or persons. Forcing an issuing bank into this investigative role would conflict with the goals of increasing the efficiency of commercial transactions, and limiting the liability of issuing banks. As the Fifth Circuit noted, "[t]he exchange function of the letter of credit rests upon objective predictable standards with de-

fined expectations and risks." *Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana de Navegacion,* 765 F.2d 1306, 1308 (5th Cir.1985). Permitting an undisclosed principal to sue the issuing bank would disrupt the "defined expectations and risks" involved in a letter-of-credit transaction.

Allowing such suits would disrupt established expectations and complicate letter-of-credit law in other ways as well. Customers often waive discrepancies in the documents presented to the issuing bank. If an undisclosed principal shared this power, an issuing bank would have to determine whether the author of the waiver was, in fact, the principal of its customer. Even if the bank found that the third party was the principal, the bank could be placed in a difficult position if the agent and principal disagreed on whether to approve non-conforming documents. Similar problems could arise if an undisclosed principal had power to amend the terms of its agent's letter of credit. The bank not only would be forced into a new investigative role, but also would have to seek approval from the undisclosed principal for any amendments offered by the agent, or risk possible suit from the principal. Such involvement would destroy the carefully constructed protection issuing banks enjoy under both the UCC and the UCP.

Mindful that it would be a "cold court indeed that attempts to weather the storm of credit analysis with nothing more than general contract principles for warmth," Dolan, Law of Letters of Credit § 2.02 at 2–5, I am compelled to depart from the holding of the Second Department in *Taub,* and to conclude instead that undisclosed principals do not have standing to sue issuing banks. Kools, however, should note that the merits of its claim have not been decided, and that there is no apparent reason why Oei, as the applicant, may not bring suit against Citibank for the bank's alleged derelictions.

Because Kools lacks standing to sue, the complaint is dismissed.

SO ORDERED: